UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ANDREW DERSHAW,

               Plaintiff,                           **Civil Action No.:** 26-cv-03200

        - against -                        **COMPLAINT**

STELLA MCCARTNEY AMERICA INC.,           **JURY TRIAL DEMANDED**
LVMH MOËT HENNESSY LOUIS VUITTON, and
AMANDINE OHAYON, individually,

               Defendants.
------------------------------------------------------------------------X

ANDREW DERSHAW ("Plaintiff"), by and through his attorneys, JOSEPH & NORINSBERG LLC., against STELLA MCCARTNEY AMERICA INC. ("STELLA MCCARTNEY"), LVMH MOËT HENNESSY LOUIS VUITTON ("LVMH"), and AMANDINE OHAYON ("OHAYON") individually, (collectively "Defendants"), alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matters as follows:

## NATURE OF THE CASE

1.     This case is about a European luxury brand that used Plaintiff for years to build and run its American business, then denied him the title, compensation, and protection his work earned. Defendants relied on Plaintiff to generate tens of millions in revenue, manage critical retailer relationships, and carry executive responsibilities far beyond his formal role. But when it came time to treat him fairly, they withheld pay, stripped benefits, denied advancement, and forced him to perform the work of a far more highly paid European female executive without giving him the title or compensation that came with the job. When Plaintiff objected to the discrimination, the unequal pay, and the wage theft, Defendants did not correct it. They punished him for it.

2.      By spring 2025, Defendants were already under investigation in Europe for anti-competitive conduct. **Undeterred by that scrutiny,** Defendants pushed unlawful pricing conduct into the United States by halting shipments, pressuring American retailers to accept coordinated price increases, **and** punishing resistance—**pressing forward even** after their own Chief Digital Officer warned in writing that the conduct was "anti-competitive (and illegal)."

3.      Plaintiff, the senior American executive responsible for key retailer relationships in the Americas, objected and refused to facilitate the scheme. Defendants retaliated. **Those objections were ultimately vindicated when,** months later, European regulators fined an LVMH-controlled fashion house €18 million for unlawful market manipulation and price-fixing.

4.      That lawlessness reflected the same Europe-first regime Defendants imposed internally. European leadership kept authority, title, pay, and protection in European hands while shifting pressure, austerity, and blame onto the American side. American customers were mocked as having "tacky American style," and even prominent American clients were treated with contempt.

5.      Plaintiff, after more than fourteen years helping build Stella McCartney's American business and generating more than $40 million in annual revenue across 200-plus locations, was denied the title, compensation, benefits, reimbursements, and security his work warranted. Instead, Defendants stole earned PTO, withheld roughly $20,000 in business expenses, and exploited him while elevating European women above him.

6.      When Plaintiff complained on January 23, 2024, that he was experiencing gender bias, Defendants falsely claimed they would take the matter seriously, then retaliated almost immediately with his first negative review. After he further complained about withheld expenses and clawed-back PTO, Defendants downgraded his annual rating, reduced his bonus, and

intensified the retaliation, including through manipulation of his performance evaluation and compensation outcomes.

7.    Defendants then forced Plaintiff to assume **the** responsibilities of the "President of the Americas" role after terminating his European female predecessor, while withholding the title and paying him roughly half of what she had earned. **As set forth below, Defendants' own CEO admitted this scheme in writing.** Defendants then worked Plaintiff as the de facto regional leader while underpaying him, isolating him, humiliating him, and trying to force him out. This action seeks relief for the full pattern of misconduct: whistleblower retaliation, sex and national origin discrimination, unequal pay, wage theft, and retaliation.

## PRELIMINARY STATEMENT

8.    Defendant LVMH and Stella McCartney wrapped themselves in the language of ethics, conscience, and accountability. What they actually built was a Europe-first hierarchy that treated the American market as a place to extract from, treated American workers as expendable, and treated American law as an inconvenience. The clearest expression of that contempt surfaced in 2025, when Defendants pushed an unlawful pricing scheme into the United States while already under investigation in Europe for similar anti-competitive conduct. Defendants halted shipments, pressured American retailers to accept coordinated price increases, punished resistance, and pressed ahead even after one of their own senior executives warned in writing that the conduct was "anti-competitive (and illegal)." Plaintiff objected because he understood exactly what Defendants were doing. Defendants swiftly retaliated against Plaintiff because they wanted obedience, not integrity. Plaintiff was ultimately vindicated when months later, European regulators fined an LVMH-controlled fashion house €18 million for unlawful market manipulation and price-fixing.

9.    But the pricing scheme was not a departure from Defendants' normal way of operating. It was the purest expression of it. The same Europe-first arrogance that led Defendants to believe they could unlawfully manipulate the American market had already been violating American civil rights, pay equity and labor laws for years to Plaintiff's detriment. LVMH controlled Stella McCartney through a hierarchy in which power, pay, title, contractual protection, long-term incentives, and advancement remained concentrated in European hands. American employees, namely Plaintiff as an American male employee was expected to execute, absorb pressure, and accept less.

10.    Plaintiff rose inside that structure because Defendants could not deny his value. Over fourteen years, he helped build Stella McCartney's American wholesale business, cultivated critical retailer relationships, and became one of the executives most responsible for maintaining and growing Defendants' presence in North America. Plaintiff was trusted when the business needed performance. Plaintiff, however, was denied equality when the conversation turned to title, compensation, and security. That unequal treatment was driven by both national origin and sex: Defendants repeatedly elevated and protected European women while requiring Plaintiff, an American man, to do more for less.

11.    That disparity was not subtle. During 2023 and 2024, nine of the ten members of Defendants' Senior Leadership Team were European women. Plaintiff was the only American male on that team, the only male head of region, and the only American executive responsible for the Americas business. The bias Plaintiff experienced persisted throughout his tenure and by late 2023 into early January 2024, the pattern had become too obvious to ignore. Plaintiff had watched European women receive promotions, titles, compensation, and protection that he, an American man carrying major commercial responsibility, was denied. Further, he was experiencing wage

theft in the form of attempted PTO clawbacks and Defendants' refusal to reimburse him approximately $20,000.00 in approved business expenses, which remain unpaid as of the filing of this complaint.

12.     Against that backdrop, Plaintiff complained. On January 23, 2024, he emailed Defendant Ohayon and stated: "I want to fill you in on the gender bias I have been experiencing lately here at Stella." Ohayon responded that Defendants were "taking this matter very seriously." And in every way, that turned out to be a complete lie.

13.     Defendants feigned concern but carried out no investigation. Defendants buried the complaint, recast it as a "career development" issue, and chose to retaliate instead. Five days after receiving Plaintiff's complaint, Defendants issued a surprise, unscheduled review attacking Plaintiff's demeanor. Three days later, Plaintiff escalated again, this time complaining of wage theft to Defendants' CFO as Defendants had reneged on allowing him to carry over his earned PTO and still had not reimbursed his expenses. In response, Defendants, for the first time in his fourteen-year tenure, downgraded his annual rating from "Exceeds Expectations" to "Meets Expectations," significantly reducing his bonus.

14.     Worse, Defendants' performance review made the illegality plain. As the primary basis for downgrading Plaintiff's rating, Defendants expressly relied on Plaintiff's good-faith complaints regarding Defendants' theft of earned PTO and Defendants' refusal to reimburse approximately $20,000 in legitimate, approved business expenses, conduct that violated New York Labor Law. In other words, Defendants turned Plaintiff's protected complaints about wage theft and unequal treatment into the excuse to punish him and silence him.

15.     Unfortunately, as Plaintiff rightfully continued speaking up regarding Defendants' undeniable discriminatory conduct, Defendants met each complaint with steeper and more brazen

acts of retaliation and discrimination. In June 2024, Defendants terminated North America President, a European woman Ida Simonsen ("Simonsen") and shifted her leadership functions onto Plaintiff, but withheld both the title and the compensation attached to it. Defendants relabeled Plaintiff "Senior Vice President of Wholesale," used him as the leader running the Americas, yet paid him approximately half of the compensation previously given to Simonsen. Indeed, Defendant Ohayon admitted the scheme in an email concerning Plaintiff's new responsibilities: "I agree they need a team leader without that person being a President." Ohayon's admission stripped away the pretense. Defendants were preserving the role, denying Plaintiff the title, and discounting the American man performing it in violation of American pay equity laws.

16.    Defendants then carried that scheme out exactly as planned. They relied on Plaintiff for regional budgeting, target delivery, key-account management, pricing judgment, and compensation implementation across the Americas. Senior leaders privately acknowledged the exploitation. Luigi Cantone told Plaintiff, "Andrew, I agree with you 100%" in response to Plaintiff pointing out that he was now doing Simonsen's job. Worse, Finance Director Elvira Demiri ("Demiri") told him, after she left the company: "She (referring to Ohayon) is using you-you did Ida's and my job."

17.    Both admissions from Defendants' own executive-level employees strip away any pretense. Defendants loaded Plaintiff with the combined duties of a higher-paid executive role and a separate director-level function, then denied him the title and compensation that those responsibilities commanded. To be sure, Defendants did not treat European employees this way. European women received the roles, pay, and institutional respect that matched the work Defendants wanted performed. Plaintiff, an American man, was the one Defendants chose to use

as bargain basement rate executive labor. Defendants protected European employees from this kind of exploitation while imposing it on Plaintiff deliberately and in plain sight.

18.     By July 2025, Plaintiff again gave Defendants, specifically Ohayon, the chance to correct the inequity. He emailed her directly, explaining that retention and morale depended on "one person - me - with no formal recognition," and asked for the title and compensation Defendants already knew he had earned. Ohayon responded with contempt and refused to address the substance of the complaint. Rather, Defendants chose to retaliate again, and even harsher this time.

19.     Defendants' retaliation grew more malignant over time and more coercive. Defendants isolated Plaintiff and openly humiliated him, while continuing to block his access to information. Defendants cancelled development meetings, gutted Plaintiff's team, increased his burdens, excluded him from critical opportunities, and humiliated him before the very retailers whose trust he had spent years earning.

20.     In or around October 10, 2025, Plaintiff was diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder and forced to take medically prescribed leave as a direct result of Defendants' unlawful and abusive conduct and the severe emotional distress that conduct caused. Rather than address Plaintiff's protected complaints lawfully, Defendants responded with escalating retaliation. That pattern reflects a profound disregard for Plaintiff's rights and for the obligations imposed by American law. As such, Defendants must be held accountable.

## JURISDICTION AND VENUE

21.     This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises in part under the Equal Pay Act, 29 U.S.C. § 206(d).

22.   This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367.

23.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred in this District and one or more Defendants transact business in this District.

## PARTIES

24.   Plaintiff Andrew Dershaw is an individual residing in the State of New York.

25.   At all relevant times, Plaintiff was an "employee" within the meaning of the Equal Pay Act, the New York State Human Rights Law, the New York City Human Rights Law, and the New York Labor Law.

26.   Defendant Stella McCartney America Inc. is, upon information and belief, a corporation authorized to do business in New York and maintains offices in New York County.

27.   Defendant LVMH Moët Hennessy Louis Vuitton is, upon information and belief, a foreign business enterprise that exercised operational control over Stella McCartney's commercial and employment decisions affecting the United States business.

28.   Defendant Amandine Ohayon was, at all relevant times, the Chief Executive Officer of Stella McCartney and a supervisor with authority over Plaintiff's compensation, reporting structure, work assignments, advancement, and other terms and conditions of employment.

29.   At all relevant times, Defendants acted as Plaintiff's joint employers and/or as a single integrated enterprise.

30.   At all relevant times, Defendants employed the requisite number of employees to qualify as employers under the statutes invoked herein.

## FACTUAL ALLEGATIONS

***Defendants Imported the Same Unlawful Pricing Scheme to the United States While Already Under Investigation Abroad***

31.    In or around the spring of 2025, Defendant LVMH was already under investigation in Europe for anti-competitive conduct and facing scrutiny abroad for unlawfully interfering with retailers' pricing freedom. Even with that cloud already hanging over them, LVMH brought the same lawless instinct into the American market.

32.    LVMH exercised binding operational control over Stella McCartney's United States business. Decisions that should have been made locally—including whether to ship product to American retailers, whether to impose price increases, and how to structure wholesale pricing—required approval from Paris.

33.    On August 29, 2024, Stella McCartney's own Global CFO, Olivier Girardon, admitted in writing that if LVMH set the policy, Stella McCartney would be "obliged to strictly follow it."

34.    As such, LVMH enforced that control through coordinated, cross-brand oversight. It circulated weekly updates to brand leaders across North America, held calls aligning approaches to shared retail accounts, and required detailed "Fashion Pack" reporting on price structure, full-price sell-through, and average retail price for "Group Purposes."

35.    Against that backdrop, in or around April 2025, Defendants engaged in outright coercive tactics with respect to American retailers. Ohayon convened a "US Tariffs Taskforce" that included Plaintiff, Girardon, and senior leadership in London. Defendants' objective was not to respond lawfully to tariff pressure or to compete on lawful terms. Defendants' objective was to force American retailers to accept an approximately four-percent price increase and to withhold product from those that refused.

36.     On April 15, 2025, Defendants reduced that directive to writing: "Wholesale shipping has been stopped for now." Defendants knowingly held approximately $850,000 in April revenue hostage to pressure American retailers into accepting the increase.

37.     That control extended directly to the pricing and shipment decisions at issue in the United States. The directives to halt wholesale shipments, impose coordinated price increases, and pressure American retailers were not isolated decisions made by Stella McCartney's U.S. team, but were executed within a structure that required alignment with and approval from LVMH-influenced leadership in Europe.

38.     These actions reflected a coordinated, top-down approach consistent with LVMH's centralized control over pricing strategy, distribution decisions, and retailer engagement across its portfolio.

39.     This was not a mistake. This was not a misunderstanding. Defendants were engaging in these tactics while already under scrutiny in Europe for similar anti-competitive conduct. Defendants acted with full awareness of the legal risk and with the same entitled conviction that they could impose unlawful restraints on the American market and get away with it.

40.     Any doubt vanished on May 8, 2025, when Chief Digital Officer Ching-Har Wong ("Wong") confirmed the obvious in writing, stating that the pricing controls were "anti-competitive (and illegal)." That warning put Defendants on direct notice from their own leadership that the conduct was unlawful. Defendants ignored it and pressed forward anyway.

41.     Unwilling to violate American laws, Plaintiff objected. Plaintiff understood that Defendants were not merely reacting to tariffs or making independent business decisions. Defendants were using shipment holds, coordinated price increases, and punitive treatment of key

accounts to force American retailers to accept terms dictated from abroad. Plaintiff repeatedly raised concerns about the legality of that conduct and objected to being used to carry it out.

42.    When Nordstrom resisted, Defendants punished Nordstrom by cancelling approximately $75,000 in orders because, in Defendants' own words, Nordstrom was being "stubborn." Plaintiff refused to become the enforcer of that coercion and instead negotiated to mitigate the damage to the retailer relationship.

43.    Defendants treated Plaintiff's resistance as the problem. **Rather than stop the misconduct, Defendants set out to make an example of him—punishing Plaintiff for upholding the very standards of integrity they publicly professed, despite internal pressure from leadership to do otherwise.**

44.    After Plaintiff raised concerns, Defendants stripped and cut his bonus by approximately $44,000, even though Plaintiff had been performing above and beyond his job title.

45.    Interestingly, Plaintiff's concerns were well founded. On October 13, 2025, the European Commission fined Loewe, an LVMH-owned fashion house, €18 million for anti-competitive resale-price restrictions that interfered with retailers' freedom to set prices and discounts.

### *The Same Europe-First Hierarchy That Drove the Unlawful Pricing Scheme Also Drove the Discrimination Against Plaintiff*

46.    At all relevant times, LVMH exercised substantial control over Stella McCartney and operated the business through a leadership structure centered in Europe. LVMH controlled strategic direction, influenced senior leadership decisions, and shaped the compensation, advancement, and reporting structures governing Stella McCartney's operations, including in the United States. **The full scope of LVMH's operational control and the basis for its liability as a**

**joint employer are set forth in detail in the "Defendants LVMH and Stella McCartney Are Joint Employers" section below.**

47.    A Europe-first hierarchy flowed from that structure. Real authority, senior titles, long-term incentives, contractual protections, and advancement opportunities remained concentrated in European hands, while American employees, especially American men, were expected to execute, absorb pressure, and deliver results without equal power, equal protection, or equal respect.

48.    From the time Plaintiff joined the Company in May 2011 through September 2025, no American held a C-suite role. During 2023 and 2024, nine of the ten members of Defendants' Senior Leadership Team were European women.

49.    Plaintiff was the only American male on that team, the only male head of region, and the only American executive responsible for the Americas business.

50.    The message was unmistakable: Europeans, and especially European women, were the people Defendants elevated and protected; Plaintiff, an American man, was the person Defendants expected to carry outsized responsibility without equal standing. **Defendants did not merely happen to favor European leadership—they deliberately built and maintained that hierarchy.**

51.    **That structural disparity extended well beyond salary and title. European executives received formal employment contracts, long-term incentive plans, sign-on bonuses, enhanced severance protections, and greater structural security. Plaintiff repeatedly requested comparable protections throughout his tenure. Defendants denied each request.**

52.    That structural inequity was further reflected in how Defendants categorized Plaintiff within their own organizational hierarchy. Despite serving as the head of an entire region and carrying the functional responsibilities of the President of the Americas role, Plaintiff was designated as a member of Defendants' "Extended Leadership Team" rather than the Senior Leadership Team—a classification that tracked European versus American status rather than actual scope of responsibility. Senior Leadership Team membership, which carried greater institutional recognition, compensation frameworks, and access to long-term incentives, was reserved predominantly for European executives regardless of functional equivalence.

53.    Upon information and belief, similarly situated European executives at Stella McCartney—particularly those at the senior leadership and C-suite level—received formal employment contracts, long-term incentive compensation, defined severance protections, and executive support resources, including dedicated administrative assistance. **These protections were designed to ensure stability, continuity, and alignment with long-term business objectives. Plaintiff, by contrast, despite performing equivalent or greater executive-level responsibilities, remained an at-will employee without comparable contractual protections, long-term incentives, or executive support—further reflecting the disparity in how Defendants treated European executives as compared to Plaintiff.**

54.    The claim that leadership shared the financial burden of the pandemic is directly contradicted by the public record. According to accounts filed at Companies House and reported by The Guardian on December 23, 2021, Stella McCartney took a salary of approximately £2.7 million from her fashion company in the year ending December 31, 2020 — an increase of more than £220,000 over the prior year. This occurred despite a 26% fall in company sales to £28.4 million, a pre-tax loss of £31.4 million, and the company claiming approximately £850,000 in

government furlough support — public funds designed to protect the employment of workers, not to subsidize leadership compensation increases. The company's public statement claimed that "senior management including Stella took a salary reduction." The accounts filed at Companies House tell a different story. Plaintiff, the American employee, absorbed a 30% salary reduction. The company's founder and leadership did not. This disparity exemplifies the same Europe-first double standard that pervades every aspect of Plaintiff's treatment: austerity was imposed downward, onto American employees, while those at the top were shielded from its consequences.

55.     Notably, Defendants' bias did not stop with their treatment of American employees. Defendants expressed the same contempt toward American customers. European leadership derided American consumers for having "tacky American style," and Arabella Rufino stated that Ikram could not sit front row because headquarters was "embarrassed by how she dressed." The message was consistent from top to bottom: Defendants viewed American employees as inferior, American customers as unsophisticated, and the American market as something to exploit rather than respect.

56.     Ikram Goldman is one of the most influential multi-brand retailers in the United States, widely recognized for shaping designer success and consumer demand. She has played a central role in elevating emerging designers to global prominence and in shaping the public fashion identity of former First Lady Michelle Obama. Her presence at fashion shows is typically among the most prominent and strategically important attendees.

57.     Defendants' statement that they were "embarrassed" by such a figure reflects not a passing comment, but a pattern of dismissiveness toward highly valuable American partners. Disregard for relationships of this caliber carries direct commercial consequences and is consistent with the broader conduct alleged herein.

58. Remarkably, and despite continually being treated as a second-class citizen with inferior terms and conditions of employment, Plaintiff excelled at what he did and built his career inside Defendants' Europe-first system. Beginning in May 2011, he rose through the Company by producing results Defendants could not ignore. He helped build Stella McCartney's American wholesale business, cultivated critical relationships with major retail partners, and became one of the executives most responsible for maintaining and growing Defendants' presence in North America.

59. By way of example, in 2012, just one year into his tenure, after both the President and Sales Manager resigned, Plaintiff performed the full duties of the U.S. President role for roughly six months while continuing to earn his regular salary. Defendants later installed Ida Simonsen into the President role and she became Plaintiff's manager, despite Plaintiff proving that he had been more than capable of doing the job. Further, Simonsen received a sign-on bonus, LTIP participation, equity, and enhanced economic support—while Plaintiff, despite taking on these additional responsibilities for six months, received no additional benefit.

60. Throughout his tenure, and while reporting into Simonsen, Plaintiff's workload, visibility, and accountability increased based on merit. However, this did not bring equal treatment in terms of compensation and recognition. In fact, while reporting into Simonsen, Defendants increasingly tasked Plaintiff with Simonsen's duties, without any commensurate increase in compensation.

61. So much so that by late 2023, Plaintiff, overworked and woefully underpaid, had accumulated a bank of 40 days of unused PTO. Further, Defendants owed him approximately $20,000.00 in legitimate business expenses that Defendants' finance department had refused to reimburse.

62. On November 29, 2023, Plaintiff, understanding that accrued PTO constituted earned compensation, emailed Human Resources and stated that his unused PTO should either be carried over or, absent that, he would use it before year-end. Human Resources confirmed in writing, that same day, that Plaintiff's PTO would be carried over. Defendants gave that assurance because they wanted Plaintiff to remain working especially during the busy holiday season.

63. Also on November 29, 2023, Plaintiff emailed both HR and Simonsen regarding his $20,000.00 of unreimbursed business expenses stating: "I feel not taken care of by this organization ... I continue to be walked over by the company. I have passed my point of frustration with the expense process and policies." In response to Plaintiff's email, Simonsen approved of his expenses. Unfortunately, shortly thereafter, Plaintiff would come to learn that this approval had just been a performative gesture.

***Plaintiff Reported Gender Bias Directly to the CEO, but Defendants Conducted No Real Investigation and Instead Marked Him for Retaliation***

64. In January 2024, only weeks after confirming in writing that Plaintiff could carry over his accrued PTO, and after securing the benefit of his continued labor through the holiday season, Defendant Stella McCartney erased 17.5 days from Plaintiff's vacation bank without warning, justification, or explanation.

65. Further, by early January of 2024, Defendants elevated a number of executives for promotion, most of whom were women, all of whom were European. Despite his lengthy tenure, loyalty to the brand, and taking on responsibilities well beyond his title, Plaintiff had been passed over, **yet again,** for promotion.

66. The arbitrary erasure of his earned PTO and Defendants' continued denial of his $20,000 of reimbursements, as well as being passed over yet again for a long overdue promotion,

was the proverbial last straw. Plaintiff decided to escalate the matter and raise his concerns of inequitable treatment directly with the Stella McCartney CEO, Defendant Ohayon.

67.     On January 23, 2024, Plaintiff sent Ohayon an email with the subject line "Gender Bias & Stella" and stated plainly: "I would love to set up some time to discuss, and I also want to fill you in on the gender bias I have been experiencing lately here at Stella."

68.     On January 24, 2024, Ohayon responded that Defendants were "taking this matter very seriously." That promise turned out to be an outright lie.

69.     After invoking "seriousness," Defendants did not investigate the discrimination Plaintiff reported. They referred him to Human Resources for a cursory and superficial call that did not meaningfully explore his complaint. They then repackaged the matter as a "career development" issue, cancelled follow-up meetings, and buried the report.

70.     Defendants did not retain an outside investigator. Defendants did not assign a neutral decision maker. They did not identify witnesses, review the comparator evidence, or request the documents most likely to expose the discriminatory structure that Plaintiff had reported.

71.     What Defendants did do, and did quickly, was put a target on Plaintiff's back. On January 29, 2024, just five days after Plaintiff complained to Ohayon, Defendants issued a surprise, unscheduled review attacking his demeanor and portraying his protected complaints as a workplace problem.

72.     On February 8, 2024, just three days after Plaintiff complained again—this time to the CFO, citing the theft of his PTO and still unreimbursed expenses, i.e., wage theft—Defendants chose to retaliate again. Defendants, for the first time ever, downgraded his annual review from "Exceeds Expectations" to "Meets Expectations," costing him approximately $20,000 in bonus compensation.

73. Of note, the review itself stated: "At times you put your personal issues ahead of your job responsibilities i.e., the issue with PTO ... and the expense report problems ...," making explicit that Defendants were using Plaintiff's protected complaints about wage theft, denial of benefits and unequal treatment against him.

74. The manipulation of Plaintiff's performance evaluation was not limited to subjective criticism, but extended to the alteration of the evaluation itself in a manner that reflects coordinated retaliation.

75. On January 23, 2025, during a scheduled performance review meeting held between approximately 12:00 PM and 1:00 PM, Plaintiff's manager, Luigi Cantone, entered and submitted Plaintiff's evaluation contemporaneously with the meeting.

76. The same evaluation further undermines any claim that the downgrade reflected a legitimate performance concern. In assessing Plaintiff's wholesale relationship management — the core function of his SVP role and the area most central to Defendants' U.S. revenue — Cantone wrote: "I saw Andrew during the sales campaign and I can confirm that he has very strong relationship with all department stores and key accounts." This is the entirety of the manager's written evaluation of Plaintiff's most critical area of responsibility. It is unambiguously positive. A manager who was absent during the review period, writing positive comments across every objective, producing a lower rating — that is the definition of a pretextual evaluation. Notably, the very relationships Cantone confirmed in writing are the same relationships Defendants then proceeded to undermine by excluding Plaintiff from Paris Fashion Week meetings with those same accounts weeks later.

77. At the time of that meeting, Plaintiff was informed that his performance rating was "Exceeds Expectations." However, subsequent records show that the rating was later downgraded

to "Meets Expectations," and **then** further modified to "Meeting / Strong," without explanation or legitimate justification.

78.    Internal system records confirm that the evaluation was actively edited during and after the review meeting, including entries timestamped during the meeting itself, demonstrating that the rating communicated to Plaintiff was not the final or fixed rating.

79.    Plaintiff's own self-assessment, submitted in the same system, rated his performance as "Exceeding Expectations," further underscoring the inconsistency between the evaluation as communicated and as later modified.

80.    These shifting and inconsistent ratings—combined with Defendants' reliance on allegedly missed financial targets that were themselves manipulated by reallocating revenue out of Plaintiff's region—demonstrate that the performance review was altered post hoc to create a pretext for retaliation and compensation reduction.

81.    The manipulation of Plaintiff's performance evaluation directly impacted his compensation, including his annual bonus, which was delayed and handled in a manner inconsistent with prior years and standard company practice.

82.    Unlike prior compensation cycles—where bonus determinations were communicated transparently and contemporaneously with performance reviews—Plaintiff was excluded from timely communications regarding his bonus and was required to seek clarification after the fact.

83.    Upon information and belief, during this same review cycle, a disproportionate number of "Exceeds Expectations" ratings and corresponding bonus outcomes were awarded to European-based employees and female employees, as well as at least one member of Plaintiff's

own team, despite Plaintiff's objectively superior performance, leadership scope, and documented results.

84.     Plaintiff's performance record for the relevant period reflects exceptional and uncontested results, including significant revenue growth, major wholesale activations, and strengthened strategic partnerships with key accounts such as Saks Fifth Avenue, Nordstrom, and Bergdorf Goodman, with no contemporaneous documentation of performance deficiencies.

85.     The combination of (i) post hoc modification of Plaintiff's performance rating, (ii) reliance on manipulated financial metrics to justify that downgrade, and (iii) irregular and opaque handling of bonus determinations, when viewed alongside the pattern of more favorable treatment afforded to similarly situated employees outside Plaintiff's protected class, supports a strong inference of discriminatory and retaliatory intent.

86.     Defendants' actions deviated sharply from established internal processes and norms, further evidencing that Plaintiff's compensation outcome was not the result of legitimate performance evaluation, but rather a pretextual justification for adverse treatment following his protected complaints.

87.     In other words, Defendants made it painfully clear that they considered abiding by American labor laws protecting Plaintiff's rights optional. No similar indifference arose when the rights or protections of European employees were at issue based on European laws. There, Defendants had no difficulty complying.

88.     As of the filing of this Complaint, Defendants still have not reimbursed Plaintiff for approximately $20,000 in business expenses, claiming supposed "technical issues." Defendants' unwillingness to reimburse Plaintiff for legitimate and approved business expenses is unconscionable. Defendants generated $87 billion in revenue globally in 2025, including

approximately $22 to $23 billion in the United States alone. A company of that size did not fail to reimburse Plaintiff because it lacked the capacity to do so. Defendants withheld the money because they chose to.

***Defendants Shifted the President Role to Plaintiff, Stripped the Title, and Slashed the Pay***

89.     In spite of Defendants' deplorable treatment of Plaintiff, by 2024, Plaintiff was not merely a senior salesperson. Plaintiff was the functional head of Defendants' North American wholesale operation—managing budgets, directing marketing strategy, leading the sales team, overseeing visual merchandising, planning inventory, and serving as the primary liaison between Defendants' American retail partners and Defendants' global leadership in London and Paris.

90.     In or about June 2024, Defendants terminated Ms. Simonsen as President of North America after eleven years of service. Because Plaintiff had already been performing the majority of Ms. Simonsen's responsibilities for years—a fact Defendants' own executives openly acknowledged—Defendants were not concerned about the transition, because Plaintiff had proven for several years that he could perform substantial portions of the leadership duties required by Simonsen's role.

91.     Consequently, when Simonsen departed, Defendants did not eliminate the leadership functions of the President role. They kept those functions intact and shifted them to Plaintiff.

92.     However, instead of legitimately promoting Plaintiff and compensating him accordingly, Defendants used the transition to strip the role of its title and discount the American man performing it.

93.     In a June 12, 2024, email, Ohayon informed Plaintiff that his new package would be "Base: $235,000 (+15% vs current)," "25% Bonus $58,750," and "Title SVP Wholesale"—

while the European woman whose role Plaintiff was now expected to fully perform had earned more than $400,000 plus bonus.

94. Plaintiff immediately recognized what Defendants were doing. On June 13, 2024, he emailed Ohayon and wrote that there was a "crucial need for strong and consistent leadership in our New York office" and that he was "confident in [his] ability to effectively manage and lead the New York office." In so writing, Plaintiff made it explicitly clear that he knew he was being expected to lead the team and officially assume Simonsen's role.

95. Ohayon's response removed any remaining doubts: "I agree they need a team leader (referring to Plaintiff) without that person being a President." Indeed, in her response Ohayon made clear that Defendants' intention was to preserve the job, assign its duties to Plaintiff, withhold the President title, and pay him substantially less than the European woman who had performed the same role before him.

96. On July 1, 2024, in an undeniable act of intimidation, Defendants arbitrarily erased an additional 20 PTO days from Plaintiff's PTO bank after assuring Plaintiff in late 2023, that he would be allowed to carry the days over into 2024. In total, Defendants arbitrarily stole 37.5 PTO days from Plaintiff's bank without justification and have yet to replace them. To be sure, no European employee endured the same level of reckless disregard for their benefits.

***Defendants' Own Communications Confirmed That They Were Using Plaintiff to Run the Americas at a Discount***

97. Although Plaintiff was initially grateful for the opportunity to advance, he became less so when it was undeniably obvious that Defendants had tasked him with additional responsibilities, in addition to Simonsen's duties, for again half of what Defendants had paid Simonsen.

98.    Plaintiff participated in monthly LVMH coordination calls chaired by the Chairman of LVMH Inc. Plaintiff communicated directly and regularly with C-suite executives across Defendants' global organization, including CEO Ohayon, Global CFO Girardon, Chief Digital Officer Wong, and Mr. Cantone.

99.    Plaintiff's role itself confirms the integrated nature of Defendants' operations. Upon his promotion to Senior Vice President of Wholesale, Plaintiff was explicitly designated as a representative of Stella McCartney in connection with LVMH U.S. corporate matters, serving as a liaison between Stella McCartney and LVMH.

100.    Internal communications confirm that Plaintiff's responsibilities included engaging directly with LVMH leadership and participating in matters involving LVMH corporate strategy and partnerships, further demonstrating that Stella McCartney operated within an LVMH-aligned structure.

101.    Plaintiff regularly interfaced with senior LVMH leadership, including Anish Melwani, Chairman and CEO of LVMH Inc. in the United States, in connection with strategic initiatives and business development opportunities.

102.    Plaintiff personally arranged a meeting with Anish Melwani and other LVMH representatives in furtherance of Stella McCartney's business interests. However, upon information and belief, Plaintiff was subsequently excluded from that meeting after having coordinated and initiated it.

103.    This exclusion is consistent with Defendants' broader pattern of marginalizing Plaintiff and removing him from critical business discussions and leadership interactions, particularly those involving LVMH and other high-level strategic partners.

104.    Documentary evidence further reflects Plaintiff's involvement in LVMH-related matters, including communications introducing external partners whose work was aligned with LVMH's strategic initiatives, and coordination with LVMH leadership on potential partnerships and opportunities.

105.    Plaintiff's executive-level access was not limited to internal operations. Defendants deployed Plaintiff as the face of the brand in negotiations with the most powerful retailers in America. Plaintiff personally negotiated gross-profit agreements with Saks Fifth Avenue involving hundreds of thousands of dollars. Plaintiff managed vendor-allowance disputes, shipping-hold decisions, and strategic pricing discussions that directly affected millions of dollars in wholesale revenue.

106.    When Saks faced financial distress in 2024, Plaintiff made the decision—alongside Defendants' finance team—to continue shipping on terms rather than demanding prepayment, telling Saks: "We've also shown up consistently—even through everything with Saks, we've continued to ship on terms (not prepaid), unlike many brands, including some of the biggest players like LVMH. We've taken on that financial risk ourselves, without credit coverage, to protect our partnership and support the business." Defendants entrusted Plaintiff with decisions that carried millions of dollars in financial risk. Defendants just refused to pay him like it.

107.    Plaintiff's authority extended to enforcing brand-control policies backed by the weight of the LVMH conglomerate itself. In communications with smaller retailers, Plaintiff wrote on behalf of Defendants: "As part of our partnership with LVMH, we regularly evaluate the alignment and performance of our distribution partners. Should your store choose not to support this pivotal season, we, along with the Fashion Group, will need to reconsider your distribution approval for the next season."

108.     Plaintiff wielded the authority of the LVMH Fashion Group, on Defendants' behalf, in direct communications with retailers. No mid-level employee carries that authority. No mid-level employee is trusted to invoke LVMH's name as commercial leverage.

109.     And as Defendants began terminating executives, Defendants simply reassigned the work to Plaintiff.

110.     By way of example, in September 2024, Defendants terminated Finance Director Elvira Demiri ("Demiri"). On a subsequent call with Demiri, upon learning of Plaintiff's increasing job functions, Demiri said exactly what was happening: "She (referring to Ohayon) is using you— you did Ida's and my job."

### *Defendants Met Plaintiff's Renewed Pay-Equity Complaint with Contempt and Then Escalated the Pressure*

111.     The incongruity between Defendants' treatment of Plaintiff and their internal recognition of his standing was made plain in or around May 2025, when Defendant Ohayon personally selected Plaintiff to serve as a mentor to her daughter. This assignment was not incidental. A CEO does not select an underperforming or expendable executive to personally mentor her own child. The selection reflected Ohayon's private acknowledgment of Plaintiff's exceptional standing, judgment, and professional caliber—qualities she simultaneously declined to recognize through title, compensation, or formal acknowledgment. This assignment directly contradicts any claim by Defendants that Plaintiff's compensation outcomes or performance evaluations during this period reflected genuine assessments of his performance.

112.     On July 9, 2025, Ohayon, despite the vast and ever growing executive-level responsibilities that Defendants had assigned to Mr. Dershaw, condescendingly and inaccurately referred to him—again, her "SVP"—as the "USA Office Coordinator" in an email to Cantone, relegating him to low-level administrative status.

113. The following day on July 10, 2025, no longer able to endure Defendants' inequitable and exploitative treatment, especially after suffering the indignity of unfairly being referred to as a "coordinator," Plaintiff again complained directly to Ohayon.

114. Plaintiff emailed Ohayon and wrote that retention, continuity, and morale in the Americas had been resting on "one person - me - with no formal recognition," and he asked for the title, compensation, and structural clarity Defendants already knew he had earned.

115. Ohayon did not respond like the leader of a lawful employer confronted with a serious complaint of inequity. She responded with contempt. She dismissed Plaintiff's concerns out of hand by responding that she needed to "focus on the rest of the team."

116. When Plaintiff later relayed Ohayon's response to Cantone in a subsequent conversation, Cantone tried to defend Ohayon by suggesting Plaintiff's timing had been off but Cantone ultimately responded "you're 100% right" as Plaintiff went on about how he had been doing Simonsen's job and more.

117. And after Plaintiff complained to Ohayon this time, unlike Plaintiff's first direct complaint to her of inequitable treatment, Ohayon did not even initiate a performative investigation. **Like Plaintiff's first protected complaint to Ohayon, however, retaliation swiftly followed.**

118. Defendants engineered the numbers to create the false narrative Plaintiff was now underperforming to justify downgrading his annual evaluation.

119. By way of background, in July 2024, Defendants had removed approximately half of the Outnet/Jobber business from Plaintiff's U.S. pipeline and shifted it to the European market, taking roughly $1 million in guaranteed invoicing out of Plaintiff's region without explanation, to simply benefit Europe as was typical.

120.    However, Defendants never adjusted America's targets or bonus metrics to reflect the transfer. Then, when the predictable $1 million gap appeared in the U.S. numbers, Ohayon blamed the American office for the very shortfall Defendants had created. On November 21, 2024, in the ultimate act of gaslighting, Ohayon wrote: "Andrew I am really counting on you and Sarah as we would be on target without that US gap"—without ever acknowledging that the actual reason for the "US gap" was Europe taking $1 million of the American office's revenue.

121.    Needless to say, when bonus time came, in 2025 Defendants used the missing revenue they had diverted into Europe as a pretext to downgrade Plaintiff and further slash his compensation.

122.    Indeed, Defendants' desire to retaliate was compounded by the fact that, around the same time as Plaintiff was fighting for equal pay, he was also resisting Defendants' illegal price-fixing scheme as described above. And when direct financial retaliation did not silence Plaintiff, Defendants resorted to humiliation, overworking Plaintiff, **and** subjecting him to professional erasure to compel his resignation.

123.    Defendants cancelled Plaintiff's career-development meetings with Human Resources. Defendants also laid off numerous North America employees and piled their work onto Plaintiff, forcing him to absorb the responsibilities of the President Americas role, the Director of Finance role, the Senior Human Resources Manager role, and even office support functions, all while refusing to pay him accordingly.

124.    Defendants further gutted Plaintiff's team, raised his sales targets by seventeen percent, delayed regional bonuses, and forced him to chase corrections personally. A Wholesale Coordinator role was eliminated, and that salary was divided and issued to Plaintiff's female teammates as a bonus while Plaintiff received nothing.

125.    Defendants further marginalized Plaintiff by awarding a Dubai business travel opportunity to a junior female employee on his team, despite Plaintiff's greater seniority and his expressed desire to travel. Defendants did not even afford Plaintiff the professional courtesy of notifying him of that decision before informing his direct report.

126.    In September 2025, Defendants made their campaign against Plaintiff explicit. Defendants excluded him from Paris Fashion Week meetings involving his own principal accounts, including Nordstrom, Saks, Bergdorf Goodman, and Bloomingdale's. When executives from those accounts asked where Plaintiff was, Defendants falsely stated that he was "not available." Defendants were not merely cutting him out internally. Defendants were deliberately diminishing him before the very business partners whose trust, goodwill, and commercial relationships he had spent years developing, thereby underscoring both the injustice and the degrading nature of their conduct.

127.    Plaintiff was the executive responsible for Defendants' most critical American wholesale relationships, including Saks Fifth Avenue, Bergdorf Goodman, Nordstrom, and Bloomingdale's. These relationships were long-standing, high-trust partnerships built over years, and Plaintiff was recognized as the primary relationship owner.

128.    As part of that role, Plaintiff routinely hosted and led executive meetings during Paris Fashion Week, facilitated introductions between Defendants' leadership and American partners, and served as the face of the brand in those interactions. His presence at these meetings was standard and expected.

129.    In advance of the show, Plaintiff made repeated efforts to obtain basic logistical information necessary to perform these responsibilities, including show location and meeting coordination. Plaintiff escalated these requests through multiple senior channels, including the

public relations team, the Head of Communications, the Chief Communications Officer, and Defendant Ohayon. Despite these efforts, Plaintiff was denied access to this information and instructed not to raise such matters further.

130.    Defendants then changed the timing and execution of key meetings involving Plaintiff's own accounts without informing him and proceeded without him.

131.    The significance of Plaintiff's exclusion is further underscored by the timing of these events. In May 2025, Nordstrom completed a transformative transaction in which the Nordstrom family, including Erik and Pete Nordstrom, took the company private in partnership with El Puerto de Liverpool. This marked a pivotal moment in the company's leadership and strategic direction. Plaintiff's relationships with Nordstrom leadership—including senior executives and members of the Nordstrom family—positioned him as a key interface for Defendants during this transition.

132.    These relationships were not superficial. Plaintiff had developed deep trust with Nordstrom leadership over many years. For example, a senior Nordstrom executive informed Plaintiff that remarks he had written in recognition of her contributions were shared internally at Nordstrom's leadership meetings, including being read aloud to approximately 200 executives, buyers, and employees, with members of leadership—including Pete and Jamie Nordstrom—made aware of and engaged with those remarks. **That same executive** reached out to Plaintiff in connection with the Paris meetings, stating that she would seek an update from the leadership meeting and asking Plaintiff to report back—reflecting the expectation that Plaintiff would be present and leading those discussions. Plaintiff had not been informed of the meeting and was excluded entirely. **Excluding Plaintiff from meetings with Nordstrom leadership at the moment the company had just undergone a major ownership and leadership transition was**

**not an oversight. It removed Plaintiff from visibility at a critical juncture, weakened his standing with one of Defendants' most important partners, and deprived Defendants of the benefit of Plaintiff's relationships precisely when those relationships mattered most.**

133.    Plaintiff's absence was immediately noticed by senior partners. During one such meeting, Tracy Margolies, Chief Merchandising Officer of Bergdorf Goodman, contacted Plaintiff directly to ask where he was. Plaintiff had no explanation, because Defendants had excluded him without notice. Similarly, Nordstrom leadership contacted Plaintiff in connection with the same meetings, expressing that they had expected him to be present and requesting updates regarding discussions he would ordinarily have led. Plaintiff was forced to respond that he had not attended the meeting. **These outreaches from the most senior levels of Defendants' most important accounts confirm the depth of trust Plaintiff had built—and the damage Defendants inflicted by removing him without warning.**

134.    Defendants' conduct formed part of a broader pattern of marginalizing Plaintiff following his protected complaints—reducing his visibility, excluding him from critical interactions, and undermining his role as the primary relationship owner for the United States market.

135.    Plaintiff's responsibilities extended beyond relationship management to identifying, developing, and advancing new commercial opportunities for Defendants. Plaintiff regularly sourced strategic partnerships and revenue-generating initiatives designed to expand Defendants' presence and performance in the United States market.

136.    Plaintiff led Defendants' engagement with Amazon Luxury, which generated measurable results, including approximately $250,000 in incremental retail sales, top-performing product rankings, and significant global exposure through marketing campaigns that achieved over

one billion impressions. These initiatives demonstrated Plaintiff's ability to drive both revenue and brand visibility through strategic partnerships.

137.    Plaintiff also developed and presented new business opportunities involving Condé Nast and its emerging commerce initiatives, including partnerships connected to Vogue and the launch of VETTE, a creator-led shopping platform. These opportunities involved high-level collaboration across marketing, media, and commerce functions and had the potential to position Defendants at the forefront of evolving digital retail models.

138.    Despite the significance of these opportunities, Defendants failed to meaningfully engage with Plaintiff's proposals, provide direction, or allocate resources necessary to evaluate or execute them. Plaintiff's efforts to advance these initiatives were met with inaction or silence.

139.    This failure to engage occurred alongside Defendants' exclusion of Plaintiff from client-facing meetings and reduction of his visibility with key partners. Taken together, Defendants' actions demonstrate a pattern of sidelining Plaintiff from both existing relationships and future business development.

140.    By disregarding opportunities sourced and developed by Plaintiff—while simultaneously removing him from core client interactions—Defendants undermined both Plaintiff's role and the Company's ability to capitalize on strategic growth initiatives in the United States market.

141.    **In sum, Defendants did not merely exclude Plaintiff from meetings—they systematically sidelined the executive responsible for maintaining Defendants' most critical client relationships and advancing the Company's growth strategy in its most important market.**

142.    The importance of these relationships is widely recognized within the luxury retail industry. Companies and senior executives treat relationships with key retail partners as critical business assets, encompassing goodwill, institutional knowledge, and long-standing commercial trust. Such relationships are developed over years and are not easily replaceable. Courts and industry participants alike recognize that these relationships, and the goodwill associated with them, provide a competitive advantage and are essential to business operations.

143.    By excluding Plaintiff from interactions with these partners and disregarding the opportunities he sourced through them, Defendants undermined valuable business relationships that formed a core component of their United States operations, as well as the goodwill and commercial advantage associated with those relationships.

### *Defendants' Unlawful Conduct Devastated Plaintiff's Health, Finances, and Quality of Life*

144.    Defendants' campaign of discrimination, retaliation, wage theft, humiliation, and exclusion inflicted severe mental, emotional, and physical harm on Plaintiff. During the period described above, Plaintiff suffered severe depression, anxiety, panic attacks, nightmares, insomnia, chronic fatigue, headaches, gastrointestinal distress, loss of appetite, and significant weight loss.

145.    On or about October 10, 2025, after months of extreme depression, anxiety, and recurring panic attacks, Plaintiff was forced to request legally protected medical leave. Defendants approved the leave and then responded the way they had responded to his other complaints—by cutting him off. Leadership ceased communicating with him and effectively isolated him altogether.

146.    Plaintiff remains on protected leave. Defendants' conduct did not merely disrupt his job. It shattered his professional identity, destabilized his finances, and severely damaged his quality of life.

147.    Plaintiff's distress was compounded by the fact that he had personally fronted approximately $15,000 to $20,000 in approved business expenses to keep Defendants' operations running, and Defendants still failed to reimburse him.

148.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost income, lost benefits, unreimbursed expenses, emotional distress, pain and suffering, reputational harm, humiliation, inconvenience, loss of enjoyment of life, and other economic and non-economic damages.

149.    Following Plaintiff's protected complaints and his commencement of approved medical leave on or about October 11, 2025, Defendants' retaliatory conduct did not cease, but instead continued and escalated through administrative and financial actions that materially harmed Plaintiff from October 2025 through the present.

150.    Plaintiff timely submitted business expense reports in October 2025 totaling over $7,000, all incurred in the ordinary course of business and in full compliance with company policy.

151.    These expense reports were submitted shortly after Plaintiff commenced approved medical leave on or about October 11, 2025, and were subsequently returned for revision on or about October 13, 2025, during a period when Defendants knew Plaintiff was on protected medical leave and unable to perform administrative tasks.

152.    Because Plaintiff was on active medical leave and had expressly notified Defendants that he was unable to perform work-related administrative functions, Plaintiff requested assistance from Human Resources on or about October 17, 2025 to facilitate processing of these expenses.

153.    Despite this request—and despite Defendants' knowledge of Plaintiff's protected medical leave status—Defendants failed to process or reimburse these expenses. As of April 2026, the expenses remain unpaid.

154.    During Plaintiff's protected medical leave, Defendants engaged in a pattern of inconsistent, delayed, and obstructive communications regarding Plaintiff's disability status, despite ongoing coordination with Plaintiff's medical provider and disability insurer.

155.    Plaintiff, through both his medical provider and direct communications, repeatedly submitted documentation supporting the continuation of his short-term disability, including formal medical certification confirming that he remained medically unable to return to work.

156.    Notwithstanding Plaintiff's ongoing protected medical leave and medical certification confirming that he was unable to return to work, Defendants asserted that Plaintiff's approved leave had expired and demanded that Plaintiff return to work by a specified date.

157.    These demands were made while Defendants simultaneously acknowledged that required disability documentation and administrative processing remained pending or incomplete.

158.    Defendants further threatened disciplinary action, including termination of employment, if Plaintiff failed to return to work or provide documentation by deadlines that were not reasonably attainable given the administrative delays and ongoing medical certification process.

159.    At the same time, Defendants' handling of Plaintiff's compensation—including bonus-related processes—was irregular and inconsistent with prior years, during which bonuses were typically paid between mid-March and mid-April.

160.    Despite Plaintiff's cooperation and flexibility in providing required documentation, including multiple extensions across distinct periods, Defendants' delays and administrative

handling effectively placed Plaintiff in a position where his compensation remained unresolved while he was simultaneously being pressured to return to work.

161.    The combination of (i) Defendants' failure to reimburse legitimate business expenses, (ii) their delay and obstruction in processing disability-related documentation, (iii) their demands that Plaintiff return to work despite ongoing medical certification, and (iv) their irregular handling of Plaintiff's compensation, demonstrates a sustained pattern of retaliatory conduct designed to exert financial and professional pressure on Plaintiff following his protected complaints.

162.    All of the foregoing conduct occurred while Plaintiff was on protected medical leave and continued through at least April 2026, further reinforcing the causal connection between Plaintiff's protected activity and Defendants' ongoing retaliatory actions.

163.    Upon information and belief, Defendants' actions—including their delay in processing disability documentation, their demands that Plaintiff return to work despite knowledge that he was medically unable to do so, and their simultaneous delay of compensation and reimbursement—had the effect of placing Plaintiff in an untenable position in which he could be characterized as failing to return to work.

164.    Given Defendants' knowledge of Plaintiff's medical status and the timing of these actions in relation to Plaintiff's compensation, this conduct supports a reasonable inference that Defendants were seeking to create a pretext for further adverse employment action, including the potential avoidance of compensation obligations owed to Plaintiff, such as bonus payments and reimbursement of earned expenses.

**DEFENDANTS LVMH AND STELLA MCCARTNEY ARE JOINT EMPLOYERS**

165.    At all relevant times, LVMH Moët Hennessy Louis Vuitton exercised substantial operational, strategic, and functional control over Stella McCartney and its business operations, including those affecting the United States. This control extended beyond ownership and included pricing authority, distribution decisions, performance evaluation systems, compensation frameworks, and executive-level decision-making.

166.    In or around early 2025, Stella McCartney formally repurchased LVMH's minority stake. However, this change in ownership did not result in a clean operational separation. LVMH continued to provide transitional support services, including human resources systems, information technology infrastructure, and performance management frameworks.

167.    Stella McCartney continued to serve as an advisor to Bernard Arnault and LVMH following the buyback, particularly in connection with sustainability initiatives, demonstrating continued strategic alignment and integration between the entities.

168.    Senior leadership further operated within a shared LVMH executive ecosystem. Defendant Amandine Ohayon, who served as Chief Executive Officer of Stella McCartney through September 2025, subsequently transitioned to Chief Executive Officer of Givenchy, an LVMH-owned fashion house, in January 2026.

169.    This movement of senior leadership between Stella McCartney and LVMH-owned entities demonstrates that executive authority, strategic direction, and operational oversight remained interconnected, and that the separation between Stella McCartney and LVMH did not constitute a true disengagement.

170.    Defendant Ohayon reported not only within Stella McCartney's internal governance structure, but also to an LVMH-aligned board or oversight structure during her tenure, further

demonstrating that Stella McCartney operated within a broader LVMH-controlled governance framework.

171.   In or around September 2025, Stella McCartney appointed Tom Mendenhall as Chief Executive Officer, succeeding Ohayon during a period of financial decline and strategic restructuring following the separation from LVMH.

172.   Upon information and belief, Ohayon remained involved in a transitional or advisory capacity following her departure, further demonstrating continuity in leadership and decision-making authority during the period in which Plaintiff's claims arose.

173.   Taken together, the shared systems, executive movement, advisory relationships, board-level oversight, and Plaintiff's own role as a liaison to LVMH demonstrate that Stella McCartney functioned as part of an integrated enterprise with LVMH during the period relevant to Plaintiff's claims.

174.   Accordingly, LVMH exercised functional control over the terms and conditions of Plaintiff's employment, as well as the business decisions that gave rise to Plaintiff's claims, and is therefore liable as a joint employer.

175.   LVMH's joint employer status is independently established by its direct control over the specific employment decisions that harmed Plaintiff. LVMH's operational control included: (i) the requirement that compensation frameworks and performance evaluation systems governing Plaintiff's employment receive alignment with and approval from LVMH-controlled leadership; (ii) the circulation of Fashion Pack reporting on price structure and performance metrics for "Group Purposes," demonstrating that LVMH monitored and directed the commercial conditions under which Plaintiff performed his work; (iii) the participation of LVMH Inc.'s Chairman in monthly coordination calls that Plaintiff attended and participated in as a representative of Stella

McCartney; and (iv) the pricing and shipment directives issued through the LVMH-aligned chain of authority that directly impacted Plaintiff's role, results, and compensation. These facts are based on Plaintiff's direct personal knowledge as a participant in these processes and are sufficient to establish LVMH's functional control over Plaintiff's employment.

176.    LVMH's control over Plaintiff's employment extended through and beyond the repurchase of its equity stake in early 2025. The adverse employment actions giving rise to Plaintiff's claims—including the stripping of the President title and corresponding compensation in June 2024, the manipulation of financial targets and downgrade of Plaintiff's bonus in 2024–2025, and the retaliation for Plaintiff's objections to the pricing scheme in spring 2025—all occurred during periods in which LVMH's operational control over Stella McCartney's business was actively exercised. The repurchase of LVMH's ownership stake did not extinguish or retroactively eliminate that control with respect to the claims at issue.

**FIRST CLAIM FOR RELIEF**
*Violation of the Equal Pay Act, 29 U.S.C. § 206(d)*
(Defendants Stella McCartney America Inc. and LVMH Moët Hennessy Louis Vuitton)

177.    Plaintiff repeats and realleges the foregoing allegations.

178.    The Equal Pay Act prohibits an employer from paying an employee at a rate less than an employee of the opposite sex for equal work requiring equal skill, effort, and responsibility, performed under similar working conditions.

179.    Defendants required Plaintiff to perform the substance of the President, North America / President of the Americas role while paying him substantially less than his female predecessor for equal work.

180.    Defendants did not merely underpay Plaintiff by accident. Defendants deliberately preserved the work, stripped the title, and discounted the man performing it.

181.    Plaintiff performed substantially equal work requiring equal or greater skill, effort, and responsibility under similar working conditions, including regional leadership, budgeting, pricing judgment, retailer management, team oversight, and cross-functional executive decision-making.

182.    For purposes of the Equal Pay Act, Plaintiff and Simonsen performed substantially equal work within the meaning of 29 U.S.C. § 206(d). During the period immediately preceding Simonsen's termination in June 2024 and throughout his tenure thereafter, Plaintiff performed the identical day-to-day functions of the North America President role—including regional P&L oversight, direct management of the senior sales team, strategic planning, retailer negotiations, and executive liaison responsibilities—under the same working conditions, in the same New York office, and subject to the same organizational reporting structure. The title was different; the work was the same.

183.    Furthermore, prior to Simonsen's departure, Defendants had already been assigning Plaintiff Simonsen's functional responsibilities for an extended period, such that the two employees were performing overlapping and equivalent duties contemporaneously. Plaintiff's performance of Presidential-level functions therefore predated Simonsen's termination, providing a period of direct, simultaneous comparator overlap sufficient to satisfy the EPA's equal work requirement.

184.    No seniority system, merit system, production-based system, or bona fide factor other than sex explains the disparity.

185.    Defendants' violation was willful.

186.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered lost wages, lost benefits, and lost bonus compensation.

**SECOND CLAIM FOR RELIEF**
*Violation of New York Labor Law § 194 (Equal Pay)*
(Defendants Stella McCartney America Inc. and LVMH Moët Hennessy Louis Vuitton)

187.    Plaintiff repeats and realleges the foregoing allegations.

188.    New York Labor Law § 194 prohibits an employer from paying an employee less than an employee of the opposite sex for equal or substantially similar work.

189.    Defendants paid Plaintiff substantially less than female comparators, including the female executive whose role Plaintiff was required to perform in substance.

190.    Defendants also paid Plaintiff less than women performing materially lesser work, while denying him the title and structural protection attached to the role he was already carrying.

191.    No lawful justification accounts for the disparity.

192.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered lost wages, lost benefits and lost bonus compensation.

193.    Because Defendants' violation of New York Labor Law § 194 was willful, Plaintiff is also entitled to an award of liquidated damages of up to three hundred percent (300%) of total wages found to be due pursuant to New York Labor Law § 198(1-a).

**THIRD CLAIM FOR RELIEF**
*Sex and National Origin Discrimination Under the New York State Human Rights Law*
(All Defendants)

194.    Plaintiff repeats and realleges the foregoing allegations.

195.    Defendants discriminated against Plaintiff on the basis of sex and national origin by maintaining a Europe-first hierarchy that privileged European executives and subordinated Plaintiff, an American male, in pay, title, advancement, structural protections, resources, and access to opportunity. The discrimination alleged here was not merely parallel discrimination on two separate axes. It operated through the combination of both. European women were elevated

and protected, while Plaintiff, an American man, was singled out to carry the burden without the same rewards or protections. That is the core discriminatory pattern animating this case.

196.   As used herein, Plaintiff's "national origin" refers to his status as a person of American national origin—born, raised, and professionally established in the United States—in contrast to the predominantly European, and specifically French and British, executives who were preferentially elevated, compensated, and protected by Defendants. Courts have recognized that discrimination against employees on the basis of their American national origin, ancestry, and the cultural and professional identity associated therewith constitutes cognizable national origin discrimination under the NYSHRL and NYCHRL. See, e.g., Vill. of Freeport v. Barrella, 814 F.3d 594 (2d Cir. 2016) (national origin encompasses ancestry and place of origin).

197.   Plaintiff further alleges intersectional discrimination: that the adverse treatment he experienced was the product of the combined effect of his sex (male) and his national origin (American), operating together within Defendants' Europe-first, female-leadership-preferred hierarchy. Plaintiff does not allege that sex alone or national origin alone would have produced the same outcome. The discrimination alleged here operated precisely because Plaintiff was an American man—the category of person Defendants systematically excluded from the protections, titles, and compensation they reserved for European women.

198.   Defendants denied Plaintiff promotions, denied him the President title while requiring him to perform President-level work, underpaid him relative to female executives, burdened him more harshly than European peers, excluded him from key meetings and development opportunities, and treated him as a second-class executive because of his sex and national origin.

199.    Defendants' conduct was not episodic. It was structural. It reflected a hierarchy in which European leadership was protected and American leadership, especially Plaintiff, was expected to produce without equal pay, equal status, or equal security.

200.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered lost wages, lost benefits, lost bonus compensation, erased PTO, unreimbursed business expenses, damage to his career, reputational harm, emotional distress, and other economic and non-economic losses. Plaintiff accordingly seeks all damages and other relief available at law, including back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorneys' fees, costs, interest, and such further relief as the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### *Retaliation Under the New York State Human Rights Law*
(All Defendants)

201.    Plaintiff repeats and realleges the foregoing allegations.

202.    Plaintiff engaged in protected activity by complaining to Defendants' CEO, Human Resources, and senior leadership about gender bias, pay inequity, unequal treatment, and related discrimination.

203.    After Plaintiff engaged in protected activity, Defendants retaliated against him by downgrading his reviews, reducing his bonus, deleting earned PTO, cancelling development meetings, mocking his complaints, excluding him from meetings and opportunities, isolating him, and escalating their efforts to push him out.

204.    Each round of retaliation increased the price of speaking up. Defendants used compensation, access, reputation, and isolation as weapons to deter Plaintiff from continuing to oppose discrimination.

205. As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered lost wages, lost benefits, lost bonus compensation, erased PTO, unreimbursed business expenses, damage to his career, reputational harm, emotional distress, and other economic and non-economic losses. Plaintiff accordingly seeks all damages and other relief available at law and in equity, including back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorneys' fees, costs, interest, and such further relief as the Court deems just and proper.

### FIFTH CLAIM FOR RELIEF
*Aiding and Abetting Discrimination and Retaliation Under the New York State Human Rights Law*
(Defendant Amandine Ohayon)

206. Plaintiff repeats and realleges the foregoing allegations.

207. Defendant Ohayon personally participated in, directed, ratified, and materially advanced the discriminatory and retaliatory conduct alleged herein.

208. Ohayon was not a passive observer. Ohayon was the senior executive who dismissed Plaintiff's complaints, admitted the stripped-title scheme in writing, mocked his renewed request for equitable treatment, and helped drive the retaliation that followed.

209. As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered lost wages, lost benefits, lost bonus compensation, erased PTO, unreimbursed business expenses, damage to his career, reputational harm, emotional distress, and other economic and non-economic losses. Plaintiff accordingly seeks all damages and other relief available at law and in equity, including back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorneys' fees, costs, interest, and such further relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

*Gender and National Origin Discrimination Under the New York City Human Rights Law*
(All Defendants)

210.    Plaintiff repeats and realleges the foregoing allegations.

211.    Defendants treated Plaintiff less well, at least in part because he was an American male, by underpaying him, stripping title from the role he performed, denying him advancement and protection, burdening him more harshly than European peers, excluding him from meetings and opportunities, and humiliating him before internal and external stakeholders. Under the NYCHRL's broad standard, Plaintiff was treated less well because the combination of his sex and national origin placed him on the wrong side of Defendants' Europe-first, women-first hierarchy.

212.    Defendants' conduct went far beyond petty slights or trivial inconveniences. It was sustained, material, and demeaning.

213.    All conduct alleged herein had its primary impact on Plaintiff in New York City, where Plaintiff was based, where he performed the overwhelming majority of his work, and where the adverse employment decisions—including the compensation determinations, performance evaluations, and exclusions from meetings and opportunities—were communicated to and experienced by Plaintiff. The NYCHRL applies to all discriminatory and retaliatory conduct the impact of which was felt within New York City, regardless of where the decision originated. See Hoffman v. Parade Publ'ns, 15 N.Y.3d 285 (2010).

214.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered lost wages, lost benefits, lost bonus compensation, erased PTO, unreimbursed business expenses, damage to his career, reputational harm, emotional distress, and other economic and non-economic losses. Plaintiff accordingly seeks all damages and other relief available at law and in equity,

including back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorneys' fees, costs, interest, and such further relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
*Retaliation Under the New York City Human Rights Law*
*(All Defendants)*

215.    Plaintiff repeats and realleges the foregoing allegations.

216.    Defendants responded to Plaintiff's protected activity with conduct reasonably likely to deter a person from engaging in such activity, including deleting earned PTO, cutting bonus compensation, downgrading reviews, cancelling meetings, excluding Plaintiff from critical opportunities, mocking his requests for equal treatment, and isolating him after protected leave.

217.    Defendants' retaliatory campaign was designed not merely to punish past complaints, but to silence future ones.

218.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered lost wages, lost benefits, lost bonus compensation, erased PTO, unreimbursed business expenses, damage to his career, reputational harm, emotional distress, and other economic and non-economic losses. Plaintiff accordingly seeks all damages and other relief available at law and in equity, including back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorneys' fees, costs, interest, and such further relief as the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF
*Aiding and Abetting Discrimination and Retaliation Under the New York City Human Rights Law*
*(Defendant Amandine Ohayon)*

219.    Plaintiff repeats and realleges the foregoing allegations.

220.    Defendant Ohayon personally participated in and helped carry out the discriminatory and retaliatory conduct alleged herein.

221.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered lost wages, lost benefits, lost bonus compensation, erased PTO, unreimbursed business expenses, damage to his career, reputational harm, emotional distress, and other economic and non-economic losses. Plaintiff accordingly seeks all damages and other relief available at law and in equity, including back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorneys' fees, costs, interest, and such further relief as the Court deems just and proper.

**NINTH CLAIM FOR RELIEF**
*Whistleblower Retaliation Under New York Labor Law § 740*
(Defendants Stella McCartney America Inc. and LVMH Moët Hennessy Louis Vuitton)

222.    Plaintiff repeats and realleges the foregoing allegations.

223.    Plaintiff engaged in protected activity by objecting to and refusing to participate in Defendants' coordinated shipment holds, coerced pricing increases, and punitive treatment of American retailers, which he reasonably believed violated antitrust law.

224.    Plaintiff's objections and refusals constituted protected activity within the meaning of New York Labor Law § 740, as amended effective January 26, 2022 (L. 2021, c. 639). Under the amended statute, an employee engages in protected activity by disclosing, objecting to, or refusing to participate in an activity that the employee reasonably believes constitutes a violation of law, rule, or regulation. Plaintiff reasonably believed, based on his own knowledge of the conduct, the written warning from Defendants' own Chief Digital Officer that the pricing controls were "anti-competitive (and illegal)," and the subsequent European Commission fine against an LVMH affiliate for identical conduct, that Defendants' coordinated shipment holds and coerced price increases violated federal and state antitrust law, including the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiff's belief was, in any event, subsequently vindicated.

225.    In addition to objecting and refusing to participate, Plaintiff disclosed his concerns regarding the legality of Defendants' pricing conduct to senior leadership within the organization, including in the context of the US Tariffs Taskforce and in direct communications with Defendant Ohayon and other executive counterparts. Such internal disclosure to a supervisor constitutes protected activity under § 740 as amended.

226.    After Plaintiff objected, Defendants retaliated against him by cutting bonus compensation, deleting PTO, escalating his isolation, excluding him from meetings, overloading him further, humiliating him, and intensifying their effort to push him out.

227.    Defendants retaliated because Plaintiff refused to help them carry unlawful conduct into the American market and refused to stay quiet about it.

228.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered lost wages, lost benefits, lost bonus compensation, erased PTO, unreimbursed business expenses, and other economic losses, as well as attorneys' fees, costs, interest, and such further relief as the Court deems just and proper.

## TENTH CLAIM FOR RELIEF
*Unlawful Deductions / Failure to Pay Earned Wages Under the New York Labor Law*
(Defendants Stella McCartney America Inc. and LVMH Moët Hennessy Louis Vuitton)

229.    Plaintiff repeats and realleges the foregoing allegations.

230.    Defendants withheld earned compensation and benefits, including deleted accrued PTO, bonus compensation that Plaintiff had earned, and approved business expenses Plaintiff personally advanced for Defendants' benefit.

231.    To the extent those sums were vested, non-discretionary, or otherwise earned wages or benefits under Defendants' policies, practices, or agreements, Defendants unlawfully withheld them.

232.    Plaintiff's annual bonus was not discretionary. It was calculated pursuant to a predetermined formula tied to defined performance metrics and communicated to Plaintiff in writing as a fixed percentage of his base salary (25% bonus target, or $58,750 at his SVP compensation level), subject to achievement of specific targets. Under New York Labor Law, a bonus that is formula-based, non-discretionary, and promised in writing constitutes "wages" within the meaning of NYLL § 190(1). See Truelove v. Ne. Capital & Advisory, Inc., 95 N.Y.2d 220 (2000). Defendants' manipulation of the financial targets on which that formula was based—by diverting approximately $1 million in revenue out of Plaintiff's region without adjusting his targets—constituted an unlawful withholding of earned wages.

233.    With respect to accrued PTO, Defendants' own written policy and the specific written confirmation provided to Plaintiff on November 29, 2023, by Human Resources that his accumulated PTO would be carried over constituted an enforceable commitment that rendered those PTO days vested and non-forfeitable compensation. Defendants' subsequent erasure of 17.5 days in January 2024 and an additional 20 days in July 2024—totaling 37.5 days—constituted unlawful deductions from earned wages in violation of NYLL §§ 193 and 198.

234.    Defendants did not merely fail to pay what was owed. They used withheld compensation as part of a broader campaign of punishment and control.

**JURY DEMAND**

235.    Plaintiff requests a jury trial on all issues to be tried.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

A.      Declaring that Defendants engaged in unlawful employment practices prohibited by the Equal Pay Act, the New York State Human Rights Law, the New York City Human Rights Law, and the New York Labor Law, and that Defendants' conduct formed part of a deliberate pattern of discrimination, retaliation, and wage theft;

B.      Awarding Plaintiff all lost wages and benefits, including back pay, front pay, lost bonus compensation, erased PTO, unreimbursed business expenses, and all other compensation wrongfully withheld or lost as a result of Defendants' conduct;

C.      An award of liquidated damages of up to three hundred percent (300%) of total wages found to be due pursuant to New York Labor Law § 198(1-a), based on Defendants' willful violations of New York Labor Law § 194;

D.      Awarding Plaintiff liquidated damages as provided by law for Defendants' willful withholding of wages and benefits;

E.      Awarding Plaintiff compensatory damages for the emotional, mental, and physical harm Defendants inflicted, including depression, anxiety, panic attacks, reputational damage, humiliation, and the destruction of his professional stability;

F.      Awarding punitive damages to punish Defendants for conduct that was intentional, malicious, lawless, and carried out with conscious disregard for Plaintiff's rights and for American law;

G.      Awarding injunctive and equitable relief, including reinstatement or, if reinstatement is not feasible, front pay in an amount sufficient to make Plaintiff whole;

H.      Awarding attorneys' fees, costs, disbursements, and expenses;

I.      Awarding pre-judgment and post-judgment interest as permitted by law; and

J.      Awarding such other and further relief as the Court deems just and proper to remedy

the full scope of Defendants' misconduct and to ensure that Defendants do not profit from

the discrimination, retaliation, and lawlessness alleged herein.

Dated:  New York, New York
        April 20, 2026

                                    Respectfully submitted,

                                    **JOSEPH & NORINSBERG LLC,**

                            By:     _____
                                    Bennitta L. Joseph, Esq.
                                    Founder & Senior Managing Partner
                                    825 Third Ave, Suite 2100
                                    New York, NY 10022
                                    T: (212) 227-5700
                                    F: (212) 656-1889