UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDREW DERSHAW,
Plaintiff,

-v-

STELLA MCARTNEY AMERICA INC., LVMH MOET HENNESSY LOUIS VUITTON, and AMANDINE OHAYON,
Defendants.

26-CV-3200 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Andrew Dershaw brings this action against Defendants Stella McCartney America Inc. ("Stella McCartney" or "SM"), LVMH Moet Hennessy Louis Vuitton ("LVMH") (together, "Company Defendants"), and Amandine Ohayon (collectively, "Defendants'), alleging that all Defendants violated the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin Code §§ 8-101, *et seq.*, and that Company Defendants violated the Equal Pay Act, 29 U.S.C. § 206(d), and N.Y. Labor Law ("NYLL") §§ 193, 194, 198, and 740. (*See generally* ECF No. 12.) Before the Court are LVMH's motion to dismiss all claims against LVMH, including Dershaw's NYLL § 740 claim for whistleblower retaliation (ECF No. 19), and Stella McCartney and Ohayon's motion to dismiss all claims against Ohayon, as well as Dershaw's NYLL § 740 claim (ECF No. 21). For the reasons that follow, both motions are granted.

## I. Background

### A. Factual Background

The following facts are drawn from Dershaw's amended complaint (ECF No. 12 ("AC")) and are presumed true for purposes of resolving the motions to dismiss. *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013) (per curiam).

Dershaw joined the New York offices of Stella McCartney, a luxury fashion brand, in May 2011. (AC ¶¶ 1, 5, 50.) LVMH was a minority investor in SM during certain periods of Dershaw's employment there, but sold its stake back to Stella McCartney in "early 2025." (*Id.* ¶ 184.) Dershaw alleges that "[a]t all relevant times, LVMH Moët Hennessy Louis Vuitton exercised substantial operational, strategic, and functional control over Stella McCartney and its business operations," including "pricing authority," "executive-level decision-making," "the terms and conditions of [his] employment," and "the business decisions that gave rise to [his] claims." (*Id.* ¶¶ 183, 192.) For instance, he pleads that LVMH approval was required for compensation frameworks applicable to his employment, that "LVMH monitored and directed the commercial conditions under which [he] performed his work" (specifically, the "price structure and performance metrics"), that LVMH participated in "monthly coordination calls" which he attended, and that "pricing and shipment directives [were] issued through the LVMH-aligned chain of authority." (*Id.* ¶ 193.)

After the buyback, "LVMH continued to provide transitional support services" to SM, "including human resources [("HR")] systems, information technology [("IT")] infrastructure, and performance management frameworks." (*Id.* ¶ 184.) Dershaw also alleges several other points of post-buyback connection between SM and LVMH: that SM continued to advise LVMH following the buyback, that Ohayon (SM's Chief Executive Officer ("CEO")) transitioned to CEO of Givenchy—a LVMH-owned fashioned house—in January 2026, and that Ohayon reported to "an LVMH-aligned board or oversight structure during her tenure" at SM. (*Id.* ¶¶ 185-186, 188.)

Over the course of fifteen years, Dershaw rose through the ranks at Stella McCartney by helping to build their wholesale business and cultivating relationships with major retail partners,

becoming "one of the executives most responsible for maintaining and growing Stella McCartney's presence in North America." (*Id.* ¶¶ 10, 60.) In 2024, Stella McCartney promoted Dershaw to Senior Vice President of Wholesale, where he was the "functional head" of SM's United States operations. (*Id.* ¶¶ 15, 91, 94-95.) Ohayon was Dershaw's supervisor and held "authority over [his] compensation, reporting structure, work assignments, advancement, and other terms and conditions of [his] employment." (*Id.* ¶ 30; *see also id.* ¶¶ 69-70, 95-97, 112, 115-117, 122.)

Dershaw alleges that Defendants discriminated against him based on his sex and national origin by maintaining a "Europe-first hierarchy that privileged European executives"—specifically, "European women"—that disadvantaged him "in pay, title, advancement, structural protections, resources, and access to opportunity." (*Id.* ¶¶ 49-65, 213.) He first complained about sex discrimination to Ohayon on January 23, 2024, when he emailed her stating: "I want to fill you in on the gender bias I have been experiencing lately here at Stella." (*Id.* ¶¶ 12, 69.) Ohayon responded that she was "taking this matter very seriously." (*Id.* ¶ 12.) Defendants then referred Dershaw to SM Human Resources for an initial phone call but cancelled his follow-up meetings. (*Id.* ¶ 71.) On January 29, 2024, Defendants issued an unscheduled review portraying his complaint as a workplace problem, and on February 8, 2024, they downgraded his annual review from "Exceeds Expectations" to "Meets Expectations," costing him approximately $20,000.00 in bonus compensation, on the ground that he "put [his] personal issues ahead of [his] job responsibilities." (*Id.* ¶¶ 73-75.) (The review was later modified to "Meeting/Strong." (*Id.* ¶ 79.))

In June 2024, Defendants terminated Ida Simonsen, a European woman, from her role as SM's North America President, and Dershaw alleges they shifted her leadership responsibilities

onto him, but withheld the "President" title from him and paid him "approximately half of the compensation previously given to Simonsen." (*Id.* ¶¶ 15, 92-97.) Ohayon wrote in an email concerning Dershaw's new responsibilities that she "agree[s] they need a team leader without that person being a President," and SM's Chief Commercial Officer ("CCO") Luigi Cantone told Dershaw that he "agree[d] . . . 100%" that Dershaw was doing Simonsen's job, as did SM's then-Finance Director Elvira Demiri, though Ohayon later referred to him as the "USA Office Coordinator." (*Id.* ¶¶ 15-16, 97, 112, 114.)

Dershaw did well in this new role. On January 23, 2025, during a scheduled performance review, Cantone—Dershaw's manager—submitted Dershaw's evaluation, which was positive with respect to Dershaw's relationship management. (*Id.* ¶ 78.) On July 9, 2025, Ohayon asked Dershaw to mentor her daughter. (*Id.* ¶ 113.) But when Dershaw requested Simonsen's prior title and compensation from Ohayon the next day, Ohayon told him that she needed to "focus on the rest of the team." (*Id.* ¶ 117.) Later in 2025, Defendants cut his bonus,[1] cancelled his career-development meetings with Human Resources, assigned him more work, raised his sales targets, denied him opportunities for business travel, excluded him from key meetings, and failed to engage with his business proposals. (*Id.* ¶¶ 121-123, 125-145.) Defendants also repeatedly failed to reimburse him for thousands of dollars in business expenses that he had fronted. (*Id.* ¶¶ 149, 153-155.)

Dershaw separately alleges that, in the spring of 2025, SM and LVMH engaged in an "unlawful pricing scheme" by halting wholesale shipments and "forc[ing] American retailers to

---

[1] At the time, Defendants cited the American office's failure to meet its regional targets and bonus metrics, but Dershaw contends that the failure actually resulted from Defendants' intentional diversion of business from the U.S. pipeline to the European market in July 2024. (AC ¶¶ 121-122.)

accept an approximately four-percent price increase." (*Id.* ¶¶ 8, 37-38.) Specifically, in April 2025, SM formed a "U.S. Tariffs Taskforce"—comprising Dershaw, Ohayon, and other senior leaders at Stella McCartney—to evaluate potential responses to newly imposed tariffs, which decided upon an approximately four-percent wholesale price increase and temporary shipment pauses during ongoing negotiations with American retailers. (*Id.* ¶¶ 37-38.) According to Dershaw, SM's Global Chief Financial Officer Olivier Girardon confirmed that Stella McCartney was "obliged to strictly follow" any policy set by LVMH regarding price increases and that the decision to increase wholesale prices by four percent (and pause shipments during negotiations) was made "within a structure that required alignment with and approval from LVMH-influenced leadership in Europe." (*Id.* ¶¶ 35-36, 39.) On May 8, 2025, SM's Chief Digital Officer Ching-Har Wong wrote that the pricing controls were "anti-competitive (and illegal)." (*Id.* ¶ 42.) Dershaw objected to and refused to participate in the pricing scheme because he believed the conduct violated antitrust law (specifically, Section 1 of the Sherman Antitrust Act). (*Id.* ¶¶ 43-46, 240-244.) Defendants then cut his bonus by approximately $44,000. (*Id.* ¶ 46.)

Dershaw experienced anxiety, depression, and panic attacks as a result of his experience at Stella McCartney. (*Id.* ¶¶ 146-147.) He therefore requested medical leave on October 10, 2025, which Defendants approved. (*Id.*) Defendants later told him his leave had expired, despite his medical certification confirming that he was unable to return to work, and threatened disciplinary action, including termination, if he failed to return to work or provide additional documentation. (*Id.* ¶¶ 157-160.) Defendants terminated Dershaw on May 22, 2026, only four days after his return from medical leave. (*Id.* ¶¶ 167, 174, 180.)

**B. Procedural Background**

Dershaw filed the complaint giving rise to this action on April 20, 2026 (ECF No. 1) and amended it on June 16, 2026 (AC). He raises ten claims, which fall into the following five categories. First, Dershaw asserts that the Company Defendants violated the Equal Pay Act, 29 U.S.C. § 206(d) (*id.* ¶¶ 195-204), and NYLL § 194 (*id.* ¶¶ 205-211), which require equal pay among employees of different sexes. Second, he asserts that the Company Defendants violated the NYSHRL by discriminating against him on the basis of sex and national origin (*id.* ¶¶ 212-217) and retaliated against him when he complained about gender bias (*id.* ¶¶ 218-222). He raises the same claims under the NYCHRL against all three Defendants. (*Id.* ¶¶ 227-231.) Third, he asserts that Ohayon aided and abetted discrimination and retaliation under the NYSHRL (*id.* ¶¶ 223-226) and the NYCHRL (*id.* ¶¶ 236-238). Fourth, he asserts that the Company Defendants violated NYLL § 740, which protects whistleblowers from retaliation for disclosing, objecting to, or refusing to participate in an activity that the employee reasonably believes constitutes a violation of law, rule, or regulation. (*Id.* ¶¶ 239-245). Fifth, he asserts that the Company Defendants violated NYLL §§ 193 and 198 by unlawfully deducting and withholding his earned wages. (*Id.* ¶¶ 246-251.)

Only the claims against LVMH, the claims against Ohayon, and the NYLL § 740 claim are at issue now. On August 31, 2026, LVMH filed a motion to dismiss all of Dershaw's claims against LVMH, as well as his NYLL § 740 claim, for failure to state a claim (ECF No. 19), along with an accompanying memorandum of law (ECF No. 20 ("LVMH Mem.")). That same day, Stella McCartney and Ohayon filed a motion to dismiss all of Dershaw's claims against Ohayon and Dershaw's NYLL § 740 claim (ECF No. 21), along with an accompanying memorandum of law (ECF No. 22 ("SM Mem.")). As to Dershaw's remaining claims, Stella McCartney and Ohayon explained that they "do not seek to dismiss" them at this juncture because they believe

"such claims turn on factual questions not appropriate for a motion to dismiss." (SM Mem. at 5 n.1.) Dershaw opposed each of these motions on September 30, 2026. (ECF Nos. 33 ("LVMH Opp."), 34 ("SM Opp.").) LVMH filed a reply in support of its motion to dismiss on October 14, 2026 (ECF No. 35 ("LVMH Reply")), as did Stella McCartney and Ohayon (ECF No. 36 ("SM Reply")).

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When reviewing a motion to dismiss, a court must "assume [the] veracity" of the allegations set forth, draw all "reasonable inference[s]" in the plaintiff's favor, and use its "judicial experience and common sense" to conduct a "context-specific" analysis of the complaint. *Id.* at 678-79. But "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (quotation marks omitted). Likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim for relief. *Id.*

## III. Discussion

### A. Dershaw's Employer

At the outset, LVMH argues that Dershaw fails to plausibly allege that LVMH was his "employer." (LVMH Mem. at 12-23.) Accordingly, LVMH claims it cannot be liable to Dershaw under the Equal Pay Act (which is part of the Fair Labor Standards Act ("FLSA")), the

NYSHRL, or the NYLL. (*Id.*) Dershaw, for his part, claims that LVMH acted with Stella McCartney as "joint employers and/or as a single enterprise." (AC ¶¶ 31, 39, 48, 183-194.)

To plead a "joint employer" theory for purposes of the FLSA, a plaintiff must allege that they have an employment relationship with each defendant. *See Yongfu Yang v. An Ju Home, Inc.*, No. 19-CV-5616, 2020 WL 3510683, at *3 (S.D.N.Y. June 29, 2020). Courts within the Second Circuit "employ two primary tests in this context to determine whether a defendant was the employer of an FLSA plaintiff: [the *Carter*] 'formal control' test and [the *Zheng*] 'functional control' test." *Id.* (citing *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984); and then citing *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003)).[2] Both tests turn primarily on whether the defendant "had immediate control over another company's employees, and even more importantly, over the particular employee alleging discrimination." *Woodell v. United Way of Dutchess Cnty.*, 357 F. Supp. 2d 761, 767 (S.D.N.Y. 2005) (cleaned up); *see also Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (same).[3]

A plaintiff may also plead an employment relationship with a defendant by alleging a "single integrated enterprise," which "turns on whether [an] alleged employer—in combination with an entity that does control plaintiff's employment—constitutes a single enterprise." *Galvez v. InvestCloud*, 822 F. Supp. 3d 382, 391 (S.D.N.Y. 2026).[4] "[M]ultiple legally distinct entities"

[2] The Second Circuit has sometimes grouped these tests together into a broader "economic realities" test. *See, e.g.*, *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141-43 (2d Cir. 2008).

[3] The same standard applies for joint-employer claims under the NYLL, NYSHRL, and NYCHRL. *See, e.g.*, *Franco v. Jubilee First Ave. Corp.*, No. 14-CV-7729, 2016 WL 4487788, at *4-5 (S.D.N.Y Aug. 25, 2016) (NYLL); *Kilkenny v. Greenberg Traurig, LLP*, No. 05-CV-6578, 2006 WL 1096830, at *4 (S.D.N.Y. Apr. 26, 2006) (NYSHRL and NYCHRL).

[4] Again, the same standard applies to single-employer claims under the NYLL, NYSHRL, and NYCHRL. *See, e.g.*, *Dobrosmylov v. DeSales Media Grp., Inc.*, 532 F. Supp. 3d

may only qualify as a single enterprise for purposes of this theory in "extraordinary circumstances." *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 134-35 (S.D.N.Y. 2020) (quotation marks omitted). The Court evaluates each of these tests with respect to LVMH in turn.

**1. Joint Employer**

**a. Formal Control Test**

Under the formal control test, the Court must assess whether Dershaw has plausibly alleged that LVMH "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter*, 735 F.2d at 12. "No one of the four factors standing alone is dispositive." *Herman*, 172 F.3d at 139.

As to the first *Carter* factor, Dershaw never alleges that LVMH had the power to hire and fire SM employees, let alone him specifically. (*See generally* AC.) As to the fourth, Dershaw alleges that LVMH continued to provide "information technology infrastructure" to Stella McCartney after the buyback in early 2025 (*id.* at ¶ 184), the functions of which may plausibly include maintenance of employment records, but he does not specifically allege that LVMH *itself* maintained employment records either before or after the buyback (*see generally id.*). Accordingly, neither of these factors weigh in favor of finding LVMH to be a joint employer under the *Carter* test.

Dershaw's allegations on the second and third *Carter* factors present slightly closer questions. As to the second factor, Dershaw does allege, albeit in a conclusory manner, that

54, 62 (E.D.N.Y. 2021) (NYLL); *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 81-82 (S.D.N.Y. 2020) (NYSHRL and NYCHRL).

LVMH "exercised substantial operational, strategic, and functional control over" SM, including "the terms and conditions of [his] employment." (*Id.* ¶¶ 183, 192.) While Dershaw offers more detailed allegations with respect to LVMH's control over SM's strategy, such as its control over SM's pricing policies (*see id.* ¶¶ 34-36, 39), he does not do so with respect to the conditions of his employment or work schedule. As a result, although Dershaw may plead that LVMH exercised control over SM's business operations at a high level, he fails to plead that LVMH "controls the day-to-day manner in which" he helped execute those operations, which is the relevant inquiry under *Carter*'s second factor. *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 127 (S.D.N.Y. 2011); *see also Godlewska v. HDA*, 916 F. Supp. 2d 246, 260 (E.D.N.Y. 2013) (it is "control over the employee's day-to-day conditions of employment," not control over "the nature of the business," that "is relevant to the joint employment inquiry" under this factor), *aff'd sub nom. Godlewska v. Hum. Dev. Ass'n*, 561 F. App'x 108 (2d Cir. 2014) (summary order). This factor thus also weighs against a finding of formal control.

As to the third factor, Dershaw pleads that the "compensation frameworks and performance evaluation systems governing [his] employment" were required to "receive alignment with and approval from LVMH-controlled leadership" and that Ohayon "reported not only within Stella McCartney's internal governance structure, but also to an LVMH-aligned board or oversight structure during her tenure." (AC ¶¶ 188, 193.) But even if Ohayon reported to an LVMH-controlled board or oversight structure, Dershaw does not plead that said board or oversight structure specifically had control over his compensation package. Indeed, he argues in his opposition to SM and Ohayon's motion to dismiss that "Ohayon Personally Set the Title and Pay at the Heart of This Case," and he specifically rejects the notion that "Ohayon [was] . . . transmitting someone else's decision." (SM Opp. at 17.) While "[i]t is long-standing

precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their [opposition] briefs," *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005), Dershaw's position is at minimum consistent with the amended complaint's failure to allege that LVMH specifically set his compensation, even if it had some influence over compensation frameworks at SM at a higher level of generality. *See Jean-Louis*, 838 F. Supp. 2d at 129-30 ("[T]he test [under the third *Carter* factor] is whether a putative joint employer *determines* pay rates, not whether it *affects* them." (emphasis added)). Taken together, Dershaw therefore has not plausibly alleged that LVMH formally controlled his employment.

**b. Functional Control Test**

Under the *Zheng* "functional control" test, courts assess "(1) whether the alleged employer's equipment and premises were used for the workers' labor, (2) whether the workers' labor could shift as a unit from one putative joint employer to another, (3) whether workers performed 'discrete line-job' work integral to the alleged employer's production process, (4) whether a subcontractor could pass responsibility to another subcontractor 'without material changes,' (5) the degree to which the alleged employer supervised the workers' labor, and (6) whether the employees labored exclusively or predominantly for the alleged employer." *Yongfu Yang*, 2020 WL 3510683, at *5 (quoting *Zheng*, 355 F.3d. at 72). "Courts need not find that every factor weighs against a finding of an employer-employee relationship to find that such a relationship does not exist." *Id.* Notably, "the *Zheng* factors are most relevant in the context of subcontractor relationships," which are not at issue here. *Hsieh Liang Yeh v. Han Dynasty, Inc.*, No. 18-CV-6018, 2019 WL 633355, at *6 (S.D.N.Y. Feb. 14, 2019) (citing *Greenawalt v. AT & T Mobility LLC,* 642 F. App'x 36, 37-38 (2d Cir. 2016) (summary order)).

As to the first *Zheng* factor, Dershaw does not plead that he ever used any of LVMH's physical equipment or physical offices to perform his work. (*See generally* AC.) While he

alleges that LVMH continued to provide IT infrastructure and performance management systems to SM (*id.* ¶ 184), he does not plead that *he* personally used them. *See, e.g.*, *Orellana v. Real Innovative Constr., LLC*, No. 18-CV-8396, 2020 WL 13469284, at *6 (S.D.N.Y. Feb. 6, 2020) (dismissing complaint against alleged joint employer where plaintiffs alleged that they used its "premises and equipment for their work" but did not provide "specific examples" of how they did so).

As to the second, third, and fourth factors—which most clearly relate to the subcontractor relationships to which *Zheng* typically applies and which are not present here—Dershaw offers a few relevant allegations as to SM's relationship with LVMH. For instance, he pleads that Ohayon left SM to take a role at a different company owned by LVMH (AC ¶ 186) and that Ms. Stella McCartney (the woman, not the company) continued to "serve as an advisor" to LVMH following the buyback, "demonstrating continued strategic alignment and integration between the entities" (*id.* ¶ 185). Dershaw also pleads that he "regularly interfaced with senior LVMH leadership" and participated in monthly calls "chaired by the Chairman of LVMH"—yet specifies that he did so "as a representative of Stella McCartney" and to serve as a "liaison between Stella McCartney and LVMH." (*Id.* ¶¶ 100-104). Moreover, Dershaw does not allege that he ever worked directly for LVMH,[5] nor that his responsibilities could or did shift between SM and LVMH.

[5] In his opposition to LVMH's motion to dismiss, Dershaw insists that he pleaded that he "wielded LVMH's own commercial authority against third parties." (LVMH Opp. at 17 (citing AC ¶ 109).) However, the paragraph he cites references "enforc[ement of] brand control policies backed by . . . the LVMH conglomerate" and a communication in which he spoke of SM's "partnership with LVMH." (AC ¶ 109.) These allegations regarding work *with* LVMH do not amount to a pleading that he was performing work *for* LVMH or on LVMH's behalf.

Taken together, Dershaw's amended complaint does not plausibly allege that SM's business could or did shift from LVMH and back, that his work at SM was integral to LVMH's production process, or that his responsibilities (or those of Ohayon and/or Ms. McCartney) could pass between SM and LVMH without material changes. Instead, it merely alleges that SM and LVMH had a business relationship. That does not make them joint employers under *Zheng*. *See, e.g.*, *Adams-Flores v. City of New York*, No. 18-CV-12150, 2020 WL 996421, at *4 (S.D.N.Y. Mar. 2, 2020) (finding plaintiff's allegation that she "served as a liaison" between her direct employer and her alleged joint employer did "not establish that [she] was constructively employed by" the alleged joint employer).

As to the fifth and sixth factors, Dershaw's allegations make clear that his labor was predominantly for SM, if not exclusively so. He alleges that Ohayon, a SM employee, "was, at all relevant times, . . . a supervisor with authority over Plaintiff's compensation, reporting structure, work assignments, advancement, and other terms and conditions of employment" (AC ¶ 30), and that Simonsen (SM's North America President), Cantone (SM's CCO), and SM's HR representatives handled his PTO, business expenses, performance reviews, complaints of discrimination, medical leave, and termination (*id.* ¶¶ 64-66, 69, 71, 74, 77-78, 115-117, 154, 175, 243). Nowhere does he reference any specific LVMH employee who had similar authority, supervision, or control over his job. Instead, as discussed in Section III.A.1.a, Dershaw only conclusorily alleges that LVMH generally had control over the terms and conditions of his employment. Just as these allegations did not suffice under *Carter*, so too they do not suffice under *Zheng*. *See Zheng*, 355 F.3d at 75 (explaining that the fifth factor applies only when supervision is so extensive that "it demonstrates effective control of the terms and conditions of

the plaintiff's employment"); *Jean-Louis*, 838 F. Supp. 2d at 126 n.7 (noting that the "two inquiries" under the fifth *Zheng* factor and the second *Carter* factor are "largely the same").

Because "[t]he overarching concern" for the joint-employer tests "is whether the alleged employer possessed the power to control the workers in question," *Herman*, 172 F.3d at 139, Dershaw fails to plead that LVMH had functional control over his position such that it qualifies as a joint employer for purposes of FLSA.

**2. Single Integrated Enterprise**

For two companies to have a "single employer" relationship, courts assess their "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240-41 (2d Cir. 1995) (quotation marks omitted). No one factor is determinative, though "control of labor relations is the central concern." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996); *see id.* (noting courts reach the single-employer conclusion only "under extraordinary circumstances"); *see also Cook*, 69 F.3d at 1240 (explaining that "the critical question" is who "made the final decisions regarding employment matters related to the person claiming discrimination").

As to the first *Cook* factor, Dershaw again insists that his allegations regarding how LVMH provided SM HR systems and IT infrastructure, as well as that LVMH and SM shared regular updates and joint calls (*see* AC ¶¶ 35, 100, 193, 184), suffice to show interrelation of operations (LVMH Opp. at 19). But this inquiry evaluates more precisely, "among other facts, whether the entities share employees, services, records, [] equipment, . . . bank accounts, inventories, and lines of credit." *Dobromyslov v. DeSales Media Grp., Inc.*, 532 F. Supp. 3d 54, 62 (E.D.N.Y. 2021) (cleaned up). Mere shared IT infrastructure, HR systems, and joint meetings fall short of the comingling contemplated by this factor. *See Musiello v. CBS Corp.*, 518 F.

Supp. 3d 782, 791-92 (S.D.N.Y. 2021) (holding that "general pronouncements" that defendant imposed "human-resources and other policies for its subsidiaries," "monitored their compliance with such policies," and had "an integrated [HR] software system" were insufficient to show single integrated enterprise).

As to the second and most important factor, Dershaw's relevant allegations are that LVMH controlled SM's strategic direction, "senior leadership decisions," "compensation, advancement, and reporting structures," "pricing authority," and other high-level operations and employment decisions are insufficient. (AC ¶¶ 35, 48, 183, 193.) But the vast majority of these allegations do not relate to employment policies. To the extent they do, LVMH's control over certain employment policies that SM "adopted . . . is insufficient to show that [LVMH] exercised centralized control over [SM's] employees." *Fenner v. News Corp.*, No. 09-CV-9832, 2013 WL 6244156, at *10 (S.D.N.Y. Dec. 2, 2013); *accord Snyder v. Advest, Inc.*, No. 06-CV-1426, 2008 WL 4571502, at *7 (S.D.N.Y. June 8, 2008). And even where plaintiffs plead a "very tight relationship[]" between two entities, the imposition of a "performance management policy" and "Competency Model" (a performance management metric) have nonetheless not been enough for courts in this Circuit to find "extraordinary circumstances so as to justify application of the single employer doctrine." *Benzinger*, 447 F. Supp. 3d at 134-35 (cleaned up).

As to the third *Cook* factor, Dershaw alleges that "[s]enior leadership" at SM "operated within a shared LVMH executive ecosystem," which he claims shows "strategic alignment and integration between the entities." (AC ¶¶ 185-186.) But the only specific facts he pleads in support of this broad allegation are Ms. McCartney's advisor relationship with LVMH and Ohayon's transition from SM to a LVMH-owned company. (*Id.*) This is not enough. "[E]mployees of each business can maintain some amount of communication with senior

employees of the other without collapsing corporate formalities." *Benzinger*, 447 F. Supp. 3d at 135 (cleaned up). Dershaw's allegations therefore do not show the "common management" required to treat LMVH and SM as a single employer; at most, they gesture toward a revolving door between two distinct companies.[6]

Finally, Dershaw's pleadings falter most clearly on the fourth factor. Courts within this Circuit have repeatedly explained that minority shareholders "are incapable, *by definition*, of controlling the actions" of the companies they invest in. *Fried v. LVI Servs., Inc.*, No. 10-CV-9308, 2011 WL 2119748, at *6 (S.D.N.Y. May 23, 2011); *see also Galvez*, 822 F. Supp. 3d at 392 (because defendant company was "an investor" but "not the sole or even majority owner," factor counseled against finding single integrated enterprise). At most, LVMH was a minority shareholder, a status which lapsed upon the buyback, after which several of the events at issue in this action took place. Put differently, even when LVMH had its maximum ownership interest in SM, it was still insufficient under this factor to consider them a single integrated enterprise.

Ultimately, it is clear that SM and its employees—not LVMH—made the relevant decisions with respect to the adverse employment actions Dershaw alleges. His amended complaint does not plausibly allege the extraordinary circumstances that would justify a rare finding of a single integrated enterprise. His Equal Pay Act, NYSHRL, NYCHRL, and NYLL claims against LVMH must be dismissed on that basis.

---

[6] Dershaw does not cure these deficiencies by imputing every adverse employment action to all three "Defendants," inclusive of LVMH. (*See, e.g.*, AC ¶¶ 70-75, 91-98, 128, 143, 182, 220, 244.) Generally speaking, "group pleading" does not "suffice to hold a parent corporation"—let alone a former minority investor corporation—"liable under either the joint employer or single employer doctrines." *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12-CV-8433, 2017 WL 3278917, at *6 (S.D.N.Y. Aug. 1, 2017).

### B. Defendant Ohayon

Dershaw asserts that Ohayon, in her individual capacity, both personally discriminated and retaliated against him, as well as aided and abetted the same. (*See* AC ¶¶ 227-231 (discrimination), *id.* ¶¶ 232-235 (retaliation); *id.* ¶¶ 223-226, 236-238 (aiding and abetting).) "To make out a claim against an individual defendant under the NYSHRL [and NYCHRL], a plaintiff must either show direct, personal involvement in discriminatory" or retaliatory "conduct, or that the defendant aided and abetted the discrimination or retaliation at issue, i.e., that the defendant encouraged, condoned or approved it." *Plasencia v. City of N.Y. Dep't of Educ.*, No. 19-CV-11838, 2023 WL 6161928, at *3 (S.D.N.Y. Sep. 21, 2023) (cleaned up); *see also Harriram v. City Univ. of N.Y.*, No. 22-CV-9712, 2026 WL 801900, at *6 (S.D.N.Y. Mar. 23, 2026) (explaining that "New York courts now apply the [same] legal standards" to NYCHRL and NYSHRL claims).

As to discrimination, Dershaw alleges that Ohayon communicated the compensation he received and acknowledged that he was performing the role of President without the title or compensation Simonsen (SM's former North America President) had. (*Id.* ¶¶ 15, 93-97.) More generally, Dershaw alleges that Ohayon held "authority over [his] compensation, reporting structure, work assignments, advancement, and other terms and conditions of employment." (*Id.* ¶ 30.) But Dershaw does not plead any facts that would allow the Court to infer that this communication or Ohayon's use of this authority were discriminatory. For example, though he alleges generally that "Defendants . . . elevat[ed] European women above him" (*id.* ¶ 5), such as by failing to compensate and title him in line with his purported predecessor (Simonsen) (*id.* ¶ 15), he offers no allegations regarding Ohayon's particular role in this discrimination except to

allege that she informed him of and had authority over his compensation.[7] But the mere fact of that "authority" is not enough to infer that Ohayon specifically "declin[ed] to give him [Simonsen's] title and compensation." (*Contra* SM Opp. at 18.) (For instance, as discussed above in Section III.A.1.a, Dershaw also alleges that LVMH had some authority, or at least influence, over his compensation. (*See, e.g.*, AC ¶¶ 183, 193.)) He attempts to place the burden on Ohayon to *deny* that she set his compensation (*id.* at 17), but it is not defendants' place to deny allegations that plaintiffs have not made in a motion to dismiss.

Dershaw's allegations about Ohayon are therefore devoid of any facts supporting an inference that she was motivated by or otherwise condoned discriminatory animus in overseeing and communicating his compensation. And to the extent Dershaw offers such facts in his allegations about all three Defendants, "it is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Surgalign Spine Techs., Inc.*, No. 22-CV-9870, 2024 WL 477031, at *4 (S.D.N.Y. Feb. 7, 2024) (quotation marks omitted); *see also Nokaj v. Pappas N.Y.*, No. 24-CV-1076, 2025 WL 2380403, at *6 (S.D.N.Y. Aug. 15, 2025) (dismissing NYSHRL and NYCHRL claims against principal of employer-entity where complaint failed to plead the principal engaged in or condoned alleged discriminatory conduct). Dershaw thus fails to state a claim of discrimination, or aiding and abetting thereof, against Ohayon in her individual capacity.

As to retaliation, Dershaw alleges that Ohayon received his complaint of "gender bias" (AC ¶¶ 12, 69) and told him that Defendants would "tak[e] this matter very seriously" (*id.* ¶¶ 12,

---

[7] The only other facts Dershaw pleads that specifically mention Ohayon range from neutral (*see, e.g.*, AC ¶ 122 (instructing him to focus on sales targets)) to positive (*see, e.g.*, *id.* ¶ 113 (asking him to mentor her daughter)). None of those allegations involve any connection to Dershaw's sex, gender, national origin, or any other statutorily protected characteristics.

70). That is enough to plausibly allege that Dershaw engaged in protected activity in his email conversation with Ohayon. But in alleging that he experienced unlawful retaliation as a result, Dershaw again only offers pleadings regarding all three Defendants—none about Ohayon's individual role in that retaliation. Specifically, Dershaw attributes all of the aforementioned mentioned retaliatory actions[8]—including, *inter alia*, the failure to "investigate the discrimination,"[9] "buri[al of] the report" actually investigating the alleged discrimination, a "surprised unscheduled review," the "downgrad[ing of] his annual review," "pil[ing ] work onto [him]," "gutt[ing his] team," "excluding [him] from Paris Fashion Week meetings," and so on—to "Defendants." (*See id.* ¶¶ 71-74, 125-132.) Dershaw pleads no facts demonstrating that Ohayon actually participated in or directed any of these actions. Indeed, his allegations do not even confirm that she necessarily knew of them, let alone approved of them. In fact, since Ohayon left SM for Givenchy in January 2026 (*id.* ¶ 186), she could not have been involved in many of the adverse employment actions he raises (for example, his negative performance evaluation, expense reimbursement issues, and termination). (*See id.* ¶¶ 57, 77-78, 175.)

The only exception to this pattern of group pleading is Dershaw's allegation that Ohayon retaliatorily referred to him as the "USA Office Coordinator" rather than with his true and more prestigious title of "Senior Vice President." (*Id.* ¶ 114; *see also id.* ¶ 225.) But this isolated

---

[8] Unlike Title VII, the "NYSHRL and NYCHRL do not require an adverse employment action in order to state a claim for retaliation." *Florence v. 72andSunny Partners, LLC*, No. 25-CV-7082, 2026 WL 2254417, at *25 (S.D.N.Y. Aug. 5, 2026) (quotation marks omitted). Instead, "the plaintiff need only plead that something happened that was reasonably likely to deter a person from engaging in protected activity." *Id.* (quotation marks omitted). But Dershaw's allegations still fail to pass muster under this more lenient standard because of his use of the impermissible "group pleading" tactic.

[9] Even if Ohayon did personally fail to investigate Dershaw's claims, "without more, aiding and abetting liability does not attach in this Circuit for failing to adequately investigate a claim of discrimination." *Kulick v. Gordon Prop. Grp., LLC*, No. 23-CV-9928, 2025 WL 448333, at *15 (S.D.N.Y. Feb. 7, 2025).

comment, standing alone, does not raise an inference of retaliation by Ohayon. *See Alexander v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 107 F. Supp. 3d 323, 330 (S.D.N.Y. 2015). And per Dershaw's own pleadings, it did not deter him from engaging in protected activity—Dershaw proceeds to plead that he engaged in purportedly protected activity *the very next day*.[10] (*See* AC ¶¶ 114-115; *see also* SM Opp. at 8.)

Because the "group pleading" tactic Dershaw otherwise uses "provide[s] no factual basis to distinguish" Ohayon's conduct from that of the other defendants, *Miranda v. S. Country Cent. Sch. Dist.*, 461 F. Supp. 3d 17, 31 (E.D.N.Y. 2020), his lumped-together allegations do not suffice to plausibly allege Ohayon's personal involvement in, or aiding and abetting of, any retaliation he may have experienced.

**C. NYLL § 740**

NYLL § 740 prohibits an employer from taking retaliatory action against an employee because the employee "discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice that the employee reasonably believes is in violation of law, rule or regulation." N.Y. Lab. Law § 740(2)(a). To state a claim under § 740, a plaintiff must plausibly allege that he (1) made or threatened such a disclosure, (2) suffered an adverse employment

[10] Dershaw suggests that he engaged in further protected activity on July 10, 2025, when he told Ohayon that "retention, continuity, and morale in the Americas had been resting on 'one person - me - with no formal recognition,' and . . . asked for the title, compensation, and structural clarity Defendants already knew he had earned." (AC ¶ 116; *see also* SM Opp. at 5, 8.) But because this communication was only a "[g]eneralized complaint[] of unfair treatment," not a "protest [of] or oppos[ition to] statutorily prohibited discrimination," it "do[es] not qualify as a protected activity" under the NYSHRL and NYCHRL. *Eckhart v. Fox News Network, LLC*, No. 20-CV-5593, 2021 WL 4124616, at *20 (S.D.N.Y. Sep. 9, 2021) (cleaned up). Accordingly, even assuming that Ohayon's "contempt[uous]" response to this complaint and failure to investigate it would deter someone from engaging in further protected activity (AC ¶¶ 117, 119), Dershaw does not adequately plead protected activity such that this would qualify as Ohayon's personal involvement in, or condonement of, retaliation.

action, and (3) his disclosure caused the employer's retaliatory action. *Thacker v. HSBC Bank USA, N.A.*, No. 22-CV-7120, 2023 WL 3061336, at *6 (S.D.N.Y. Apr. 24, 2023).

Dershaw's § 740 claim rests on his allegations regarding the SM U.S. Tariffs Taskforce's plan to increase wholesale prices by approximately four percent and withhold shipping while negotiating this increase with American retailers. (AC ¶¶ 8, 37-38.) Dershaw alleges that he refused to participate in this pricing scheme because he believed it violated antitrust law (*id.* ¶¶ 43-46, 240-244) and that Defendants then retaliated against him by slashing his bonus (*id.* ¶ 46).

These allegations are too vague to satisfy the first element of a § 740 claim. While Dershaw alleges that he "repeatedly raised concerns about the legality" of this plan and "objected to being used to carry it out" (*id.* ¶ 43), nowhere does he plead to whom he raised these concerns, let alone that he directed these concerns "to a . . . supervisor or a public body, as Section 740 requires." *Skaf v. Google LLC*, No. 25-CV-6029, 2026 WL 2185588, at *8 (S.D.N.Y. July 29, 2026), *reconsideration denied*, No. 25-CV-6029, 2026 WL 2516963 (S.D.N.Y. Aug. 26, 2026). Moreover, Dershaw pleads only the vaguest sense of their content: "concerns about . . . legality." (AC ¶ 43.) But to state a claim under § 740, "it is not enough . . . to say that the conduct is 'legally dubious.'" *Skaf*, 2026 WL 2185588, at *8 (quoting *Thacker*, 2023 WL 3061336, at *8). Dershaw must have "communicated a belief that" the activity in question "was actually illegal"; to oppose an activity on the grounds that it *might* be illegal "is closer to [the insufficient] contention that [the] conduct was legally dubious than it is to a contention that [the defendant]

was actually violating the law." *Id.* (quotation marks omitted). Accordingly, Dershaw's whistleblower claim must be dismissed.[11]

## IV. Leave to Amend

Finally, Dershaw requests leave to amend on the grounds that "additional facts bearing on LVMH's control over Stella McCartney[]," as well as "who approved Plaintiff's compensation and title," "are within [Defendants'] possession, not Plaintiff's." (LVMH Opp. at 27; SM Opp. at 22.) Defendants oppose on the grounds that Dershaw has not identified which facts would cure the deficiencies in his pleadings. (LVMH Reply at 15; SM Reply at 16.) The Court agrees. Because Dershaw has already amended his complaint once, it is his burden at this stage to identify specific "additional facts [that] may entitle [him] to relief." *In re SAIC Inc. Derivative Litig.*, 948 F. Supp. 2d 366, 392 (S.D.N.Y. 2013). He has not done so, so leave to amend is not warranted.

Dershaw suggests that "[d]iscovery on those subjects will proceed in any event" given Defendants' decision not to move to dismiss his remaining claims in this case (SM Opp. at 22), but this argument is misplaced. It is not plainly obvious that discovery on the remaining claims will necessarily reveal pertinent facts about LVMH or Ohayon's authority given the limitation of their scope (namely, to SM's conduct). And even if they did reveal such facts, Dershaw again does not specify what they are, as required when seeking leave to amend. Leave to amend is therefore denied.

---

[11] Because he fails to satisfy the first of § 740's pleading requirements, the Court need not and does not address SM's contention that Dershaw's belief of illegality was unreasonable.

## V. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED in their entirety. LVMH and Ohayon are hereby terminated as defendants in this action, and Dershaw's Ninth Cause of Action under NYLL § 740 is dismissed.

Stella McCartney shall file an answer to the remaining claims within 14 days of the date of this opinion and order. (*See* Fed. R. Civ. P. 12(a)(4)(A).)

The parties shall file a proposed case management plan within 14 days of the date of this opinion and order. (*See* ECF No. 38.)

The Clerk of Court is directed to close the motions at Docket Numbers 19 and 21 and terminate LVMH and Ohayon from the docket.

SO ORDERED.

Dated: November 23, 2026
New York, New York

J. PAUL OETKEN
United States District Judge